| | | |
|---|---|---|
| Linda Ortega | ) | |
| | ) | No. 11 C 8477 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| Chicago Public School of | ) | |
| the Board of Education of | ) | |
| the City of Chicago and | ) | |
| Adelfio Garcia. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Ortega filed this lawsuit against her former employer, the Chicago Board of Education[1] (the "Board"), and the principal of the school where she was a teacher, Adelfio Garcia ("Principal Garcia"), in his individual capacity, alleging discrimination and retaliation claims against both defendants in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* ("Count IV"). R. 37. Defendants ask the Court to grant summary judgment in their favor. R. 74. For the reasons discussed below, Defendants' motion for summary judgment is granted in part and denied in part.

---

[1] Plaintiff names the Chicago Public School of the Board of Education of the City of Chicago as one of the defendants. The Court references that body's more commonly used title—Chicago Board of Education—in the memorandum opinion, but it refers to the same party.

# Background

## I. Local Rule 56.1

Before discussing the underlying facts, the Court must first address the parties' numerous failures to comply with Local Rule 56.1.

### A. <u>Ortega's Response to Defendant's[2] Local Rule 56.1 Statement</u>

Local Rule 56.1 requires a party seeking summary judgment to file a statement of material facts, submitted as short numbered paragraphs containing citations to admissible evidence. L. R. 56.1(a); *see also Ace Hardware Corp. v. Landen Hardware, LLC*, 883 F. Supp. 2d 739, 741 (N.D. Ill. 2012). Local Rule 56.1 also requires the opposing party to either admit or deny each paragraph and cite to its own supporting evidence. L. R. 56.1(b)(3)(A). As a result, any facts that a party improperly purports to controvert in its Local Rule 56.1 response are deemed admitted. *Hinton v. USA Funds*, No. 03 C 2311, 2005 WL 730963, at *1 n. 2 (N.D.

---

[2] In her response brief, Ortega concedes that the claims against Garcia "are redundant and may be dismissed." R. 95 at 19. Garcia, therefore, is dismissed as a defendant in this case and the Court refers to a singular "Defendant"—the Board— throughout the opinion. Defendant claims in reply that Ortega fails to address its argument that the ADA claims against Garcia in his individual capacity should be dismissed because the ADA does not permit individual liability. Even if Ortega's aforementioned concession did not encompass the individual claims against Garcia under the ADA, Ortega's failure to respond constitutes waiver. *Woods v. Clay*, No. 01 C 6618, 2005 WL 43239, at *16 (N.D. Ill. Jan. 10, 2005) (finding plaintiffs waived any argument in opposition when they failed to respond to defendants' argument on summary judgment) (citing *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996)). Further, it is "well-settled in this Circuit that both the ADA and Title VII provide only for employer liability, not individual liability." *Brantley v. Ameritech New Media*, No. 04 C 240, 2004 WL 1403757, at *2 (N.D. Ill. June 22, 2004) (citing *Silk v. City of Chicago*, 194 F.3d 788, 797 n. 5 (7th Cir. 1999)).

Ill. Mar. 30, 2005) (citing *Wilkins v. Riveredge Hosp.,* No 02 C 9232, 2004 WL 906010, at *2 n. 3) (N.D. Ill. Apr. 26, 2004)).

Many of Ortega's responses to Defendant's Rule 56.1 statement contain allegations that are unsupported by citations to the record. While the Court draws all inferences in favor of the non-moving party, an adequate rebuttal of a supported assertion of fact requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *Groshon v. Trans Union, LLC,* No. 12 C 7591, 2014 WL 683747, at *3 (N.D. Ill. Feb. 21, 2014). The consequence of Ortega's failure to comply with Local Rule 56.1 is that her responses without citation to the record are disregarded by the Court, and the Defendant's factual allegations to which they are directed are deemed admitted.[3] *De v. City of Chicago*, 912 F. Supp. 2d 709, 712-13 (N.D. Ill. 2012) (citing L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")).

Pursuant to Rule 56.1, the party opposing summary judgment must also give "a concise response" to each of the movant's statements. L. R. 56.1(b). *Bennett v. Unitek Global Servs.*, LLC, No. 10 C 4968, 2013 WL 4804841, at *3 (N.D. Ill. Sept. 9, 2013). Lengthy recitations of additional facts in Ortega's responses are not proper. For example, Ortega's response to Paragraph 13 of Defendant's statement of facts is nearly three full pages composed of four paragraphs. Such a response is

---

[3] Accordingly, the Court disregards the following responses to Defendant's statement of facts for failure to comply with Local Rule 56.1: Pl. 56.1 Resp. (R. 92-2) ¶¶ 16 (first sentence), 18, 19, 30, 33, 41 (first sentence), 42, 48.

improper and will not be considered.[4] Certain of Ortega's Local Rule 56.1(b)(3)(B) statements also assert facts that are not fairly responsive to the corresponding paragraphs of Defendant's Local Rule 56.1(a)(3) statement. As such, the Court disregards the additional facts contained therein and deems the Defendant's facts admitted.[5] *See id.* at *4; *Flores v. Giuliano*, No. 12 C 162, 2014 WL 3360504, at *2 (N.D. Ill. July 9, 2014).

Relatedly, "[f]acts presented only in response to a defendant's statement of facts, but not in the plaintiff's own statement of additional facts are improper because the defendant has no mechanism to reply or otherwise dispute them." *Wilcox v. Allstate Corp.*, No. 11 C 814, 2012 WL 6569729, at *5-7 (N.D. Ill. Dec. 17, 2012) (citing *Woods v. Von Maur, Inc.,* 837 F. Supp. 2d 857, 863 (N.D. Ill. 2011)). Therefore, any additional factual assertions contained within the paragraphs of Ortega's response to Defendant's 56.1 statement will not be considered as facts "affirmatively demonstrating why summary judgment should be denied." *Wilcox*, 2012 WL 6569729, at *6 (quoting *Woods*, 837 F. Supp. 2d at 863). However, they are properly before the Court for the limited purpose of determining the basis for Ortega's denial of Defendant's factual assertions. *Id.* ("[u]sing such evidence to directly dispute [the defendant's] fact is fine . . . ." (citing *Woods*, 837 F. Supp. 2d at 873)).

---

[4] The Court also disregards those portions of other responses that rely on Ortega's response to paragraph 13. Pl. 56.1 Resp. ¶¶ 14-15.

[5] *See* Pl. 56.1 Resp. ¶¶ 41, 44, 53.

Ortega further responds to certain statements of fact by claiming that she can "neither admit nor deny" them or "has insufficient knowledge" to admit or deny. This type of response is inappropriate at the summary judgment stage as it neither admits nor denies Defendant's facts and is unsupported by citations to the record. *See Ace Hardware*, 883 F. Supp. 2d at 742-43; Pl. 56.1 Resp. ¶¶ 13, 29 (R. 92-2). To the extent that Ortega so responds in paragraphs 13 and 29, Defendant's corresponding facts are deemed admitted insofar as they are supported by the record. *Ace Hardware*, 883 F. Supp. 2d at 742-43 (citing *Marchman v. Advocate Bethany Hosp.*, No 04 C 6051, 2006 WL 1987815, at *6 (N.D. Ill. July 12, 2006)).

Additionally, Ortega's responses objecting to the relevance of the stated facts do not constitute denials. *Wilcox*, 2012 WL 6569729, at *5-7 (citing *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 818 (7th Cir. 2004) (non-moving party's assertion that allegations in movant's 56.1 statement were "irrelevant" does not excuse the nonmoving party from "at least indicating that it agrees with or denies the allegation")). Those facts will be deemed admitted.[6]

### B.  **Ortega's Statement of Additional Facts**

Defendant objects to several of Ortega's statements of additional facts for failure to comply with Rule 56(c) of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules. R. 104. Specifically, Defendant argues that certain facts are not supported by admissible record evidence. *See id.* ¶¶ 4, 7, 22, 29, 38. Moreover, Defendant claims Ortega improperly cites to material not provided to the Court in

---

[6] *See* Pl. 56.1 Resp ¶¶ 36, 40.

support of certain facts. "[T]he nonmovant's statement of additional facts, must 'be supported by specific references to the record.'" *De*, 912 F. Supp. 2d at 712-13 (quoting *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000)). The Court does not accept Ortega's factual assertions as being supported when the record lacks the cited material.[7] Facts citing material not provided to the Court, along with those unsupported by any reference to the record, will be disregarded.

Ortega's statement of additional facts also includes improper argumentative characterizations of facts. For example, Ortega states that Principal Garcia asked Ortega to complete assignments that were "not even possible" and that Principal Garcia made an "impossible" request of Ortega. *See* Pl. Addt'l. 56.1 ¶ 6 (R. 92-2)[8]. The Court will disregard this type of argumentative language as it is improper. *Ace Hardware*, 883 F. Supp. 2d at 743.

### C.     Defendant's Response to Ortega's Rule 56.1 Statement of Facts

In several of Defendant's responses to Ortega's Rule 56.1 statement of additional facts, Defendant states that it "do[es] not dispute that [the witness] testified as stated." *See* Def. 56.1 Resp. ¶¶ 1, 2, 3, 5, 8, 9, 10, 14, 16, 17, 21, 23 (R. 104). However, "[i]f a party disputes a statement, it must point to specific evidence

---

[7] On multiple occasions, Ortega cites to exhibits that are not attached as "subject to Protective Order," without explaining why she did not seek leave to file them under seal or did not otherwise seek to submit them under a protective order for summary judgment review. *See* Pl. 56.1 Resp. ¶¶ 29, 31, 34, 36. The portions of these responses citing to documents outside the record are disregarded by the Court.

[8] Ortega's response to Defendant's Local Rule 56.1 statement of fact has the same docket number (R. 92-2) as her Local Rule 56.1 additional statement of facts. For distinction, the Court will refer to her additional statement of facts as Pl. Addt'l 56.1.

in the record to support its contention. Otherwise, that statement is deemed admitted. *Gross v. Radioshack Corp.*, No. 04 C 4297, 2007 WL 917387, at *6 n.11 (N.D. Ill. Mar. 26, 2007) (citing L. R. 56.1(b)(3)). Thus, the facts to which Defendant so replies will be admitted.[9] *Id.* (admitting facts where, defendant, in its local rule response, did not specifically deny that statements were made and instead responded, "[the witness] so testified.").

In sum, based on the Court's findings, the Court disregards Ortega's responses (or the portions described herein) to Paragraphs 6, 13, 14, 15, 16, 18, 19, 29, 30, 31, 33, 34, 36, 40, 41, 42, 44, 47, 48, 53 of Defendant's statement of facts and deems the facts admitted. Similarly, the Court disregards Defendant's responses to Paragraphs 1, 2, 3, 5, 8, 9, 10, 14, 16, 17, 21, 23 of Ortega's statement of additional facts and deems the facts admitted.

## II.   Background Facts

Ortega began working for the Board in 1998. Def. 56.1 ¶ 1. In February 2001, she started working full time at Hedges Elementary School ("Hedges") in Chicago. *Id.* Principal Garcia was employed by the Board for 18 years. *Id.* ¶ 2. He became Principal of Hedges in July 2006. *Id.* For purposes of this motion, Defendant does not dispute that Ortega had a left-arm paralysis disability at the time of the events in this case. R. 75 at 4. Pl. Addt'l. 56.1 ¶¶ 7.

For the 2008-09 school year, Hedges had "departmentalized" classes for students in the middle school grades (grades six through eight). Def. 56.1 ¶ 9. The

---

[9] The same goes for Ortega's response to Defendant's 56.1 ¶ 47, where she "[a]dmit[s] this is what the board claims."

classes are "departmentalized" in that teachers teach specific subjects, such as language arts, mathematics, science, and social studies,[10] instead of teaching all subjects to a particular class of students. *Id.* ¶ 10. Principal Garcia assigned four teachers to teach sixth graders for the 2008-09 school year. *Id.* ¶ 11. Ortega taught language arts; Brian Cerda taught social studies, Alejandro Perez taught math; and Linda Smith taught science. *Id.* Ortega taught all of the language arts classes that year. Pl. Addt'l. 56.1 ¶ 8. For the subject of language arts, teachers were to grade students in five areas: (1) Reading in the English Language Standards ("ESL")or Reading in the non-English Language Standards (for example Spanish); (2) Writing Standards; (3) Listening Standards; (4) Speaking Standards; and (5) Research Standards. Def. 56.1 ¶ 37. This specific grading criteria did not apply to mathematics, social studies or science. *Id.* ¶ 38.

During that same year, Principal Garcia had a different system for the seventh and eighth grade teachers at Hedges. *Id.* ¶ 12. Each of the seventh and eighth grade teachers taught two subjects. *Id.* They all taught language arts, in addition to one of three other core subjects—science, mathematics, or social studies. *Id.*

Lead Literacy Coordinator

In 2008, Ortega was working as the Lead Literacy Coordinator at Hedges. *Id.* ¶ 26. As a Lead Literacy Coordinator, Ortega's job duties included observing teacher

---

[10] Both the terms "social studies'" and "social science" are used to describe this subject matter throughout the record and briefing on the motion for summary judgment. The Court uses them interchangeably as any distinction is irrelevant for purposes of this opinion.

instruction, giving feedback, and turning in required paperwork. *Id.* ¶ 28. As the Lead Literacy Coordinator, Ortega was supposed to submit a weekly schedule of her activities to Principal Garcia. *Id.* ¶ 33. As a principal, Principal Garcia was the "instructional leader" of the school, which entailed supervising the Lead Literacy Coordinators. R. 76, Ex. D at 20:17-21:13. If principals could not be present during observations that the Lead Literacy Coordinators conducted, they had to be part of the pre- and post-conference meetings with the teachers. Def. 56.1 ¶ 29. Therefore, Lead Literacy Coordinators had to share their pre- and post-conference notes with their principals so that the principals would know what the Lead Literacy Coordinators were working on with the teachers. *Id.* ¶ 30. Ortega "often" submitted schedules that did not contain enough detail to support her time in the classrooms observing other teachers. *Id.* ¶ 33. In January 2008, Principal Garcia requested additional information from Ortega regarding her weekly schedule and requested a copy of the pre- and post-observation notes she took while in the teachers' classrooms. *Id.* ¶¶ 26, 27 & 33.

During the 2007-08 school year, Wendy Olesky was the reading coach for a section of the Chicago Public Schools ("CPS"), which included Hedges. *Id.* ¶ 28. The reading coach monitored and coached Lead Literacy Coordinators in each school. *Id.* Olesky worked with Ortega during that time. *Id.* From time to time, Olesky made requests to Principal Garcia for paperwork from Ortega that was due to her. *Id.* ¶ 31. This paperwork reflected what Ortega was doing in the classroom and provided insight as to whether Olesky needed to provide more coaching to Ortega. *Id.*

Principal Garcia forwarded Olesky's requests to Ortega and followed up with her on those requests. *Id.* ¶ 32.

Moving Books and Supplies

Another sixth grade teacher at Hedges, Alejandro Perez, testified that there were instances when Ortega would ask Principal Garcia for "help in, for instance, getting materials to her classroom." Pl. Addt'l. 56.1 ¶ 17. Principal Garcia "would tell her to get the help however she could." *Id.* In November 2007, Ortega asked Principal Garcia for help moving books and school supplies. Def. 56.1 ¶ 23. Ortega received the requested assistance two months later when Principal Garcia instructed an assistant principal to create a sign-in sheet for student helpers to help all teachers with small projects. *Id.* ¶ 25.

At-Risk Student Intervention Lists

In early 2009, third to eighth grade teachers at Hedges were required to compile a list of students who were at risk of failing and to describe the interventions being used to help them. *Id.* ¶ 40. In January or February of 2009, all of the teachers in the sixth grade, including Ortega, asked Principal Garcia for additional time to complete their lists. Pl. Addt'l. 56.1 ¶ 15; Def. 56.1 ¶ 41. Perez observed Ortega ask for more time to complete her list of student interventions because of her left arm paralysis. Pl. Addt'l. 56.1 ¶ 16. Principal Garcia's response to Ortega was "just get it done." *Id.* Principal Garcia gave all of the teachers more time—until the end of the week—to complete their reports. Def. 56.1 ¶ 41; Pl. Addt'l. 56.1 ¶ 15.

<u>May 8, 2009 Cautionary Notice</u>

On April 20, 2009, Principal Garcia forwarded Ortega a letter from a parent complaining about her child's language arts grades and homework that Ortega had given to the student. *Id.* ¶ 43. Principal Garcia notified Ortega that a meeting would be scheduled with the parent and told Ortega to have the necessary documents to support the grade she gave to the student ready for the meeting. *Id.* On or about April 30, 2009, Principal Garcia notified Ortega that the meeting was scheduled for May 4, 2009, and reminded Ortega that she should have all required documentation ready. *Id.* ¶ 44. At the May 4, 2009 meeting, Ortega failed to provide the supporting documents to justify the student's grades. *Id.* Principal Garcia then gave Ortega additional time, until May 8, to submit the information. *Id.* ¶ 45. On May 8, 2009, Ortega failed to provide supporting documents for the grades she gave to the student. *Id.* Principal Garcia gave Ortega a cautionary notice for failing to follow a directive. *Id.*[11]

Another teacher, Diane Atkinson, was present when Principal Garcia issued Ortega the cautionary notice. Pl. Addt'l. 56.1 ¶ 7. According to Atkinson, Ortega told Principal Garcia that she needed more time because of her left arm paralysis and he gave her the cautionary notice.[12] *Id.*

---

[11] Pursuant to the Board's Employee Discipline and Due Process Policy, a cautionary notice is a non-disciplinary written statement. Def. 56.1 ¶ 45.

[12] Defendant argues that Atkinson was not present when Garcia gave Ortega the assignment and lacks personal knowledge of Garcia's reason for issuing the notice. R. 105 at 3. However, Atkinson testified that she was present when Ortega told Garcia she could not finish the assignment because of her left arm paralysis, Garcia left, and then Garcia came back up with a cautionary notice. Pl. Addt'l. 56.1 ¶ 7.

<u>Restructuring for 2009-2010 School Year</u>

In October 2008, Hedges adopted the Board's Middle School Specialization Policy for sixth through eighth grade teachers. R. 92, Ex. S. The policy provided, in relevant part:

PURPOSE:

To require 1) that Chicago Public Schools ("CPS") students in grades 6, 7, and 8 receive instruction in Language Arts, Mathematics, Science and Social Studies from teachers recognized by the Illinois State Board of Education as Middle Grade Content Area Specialists in those content areas; and 2) that a sufficient number of teaching positions be programmed for Middle Grades Content Area Specialist teachers.

POLICY TEXT:

    I.      Definitions: For purposes of this policy, the following definitions shall apply:

    A.      "Middle Grade Content Area Specialist" means a teacher who either: 1) possesses a middle grades content area endorsement from the Illinois State Board of Education in Language Arts, Mathematics, Science, and/or Social Science; or 2) through the school year 2010-2011 only, has been authorized by the Illinois State Board of Education to teach in those middle grade content areas pending completion of required course work and is making annual progress towards completing endorsement requirements.

    .    .    .

    II.     Required Staffing and Assignment of Content Area Specialists to Provide Instruction in Content Areas.

Effective at the start of the 2009-2010 school year, principals and unit administrators at schools and units serving students in the Middle Grades shall ensure that the Middle Grades students receive

---

Viewing the facts in a light most favorable to Ortega, Atkinson's testimony is sufficient to support that sequence of events.

instruction in Language Arts, Mathematics, Science and/or Social Studies from a Middle Grade Content Area Specialist in the appropriate content area.

Pl. Addt'l. 56.1 ¶ 24. Tinesha Woods, the project manager in the Board's Office of Instructional Design and Assessment from August 2008-December 2009, R. 104 Ex. 1 (Woods Decl.), was assigned to develop a rollout plan for the Board's middle school specialization policy. *Id.* ¶ 4. According to Woods, teachers who lacked the "content area endorsement" could submit a "letter of intent" to the Office of Instructional Design and Assessment signed by the teacher's principal or the principal's proxy. *Id.* Principals had discretion as to whether or not to sign it. *Id.* Otherwise, teachers needed to have their middle grade endorsements (meaning that they could teach those subjects) before the 2009-10 school year. R. 92, Ex. S. Ortega received her language arts endorsement in January 2009. R. 92, Ex. Y.

Before the 2009-2010 school year, Principal Garcia made two staffing decisions that impacted Ortega. In early February 2009, Principal Garcia learned that assessment scores for the students in the bilingual program had declined. Def. 56.1 ¶ 13. In response, he decided that approximately twelve teaching positions would require a bilingual endorsement for the 2009-10 school year. *Id.* One of those positions was Ortega's. *Id.* At the same time, Principal Garcia also decided it was the most efficient use of his staff to structure the sixth grade program for the 2009-10 school year as he had the seventh and eighth grade programs. *Id.* ¶ 14. That change required three remaining sixth grade teachers (besides Ortega) to teach

language arts and one other subject—either mathematics, science or social science—just like the seventh and eighth grade teachers. *Id.* ¶ 15.

Principal Garcia needed the approval of the Board's Work Force Planning Unit's ("WFPU") to make the proposed changes. *Id.* ¶ 17. Sometime on or before May 30, 2009, he submitted his redefinition recommendations to the WFPU, as reflected in a document titled, "HR Activity Profile." R. 92, Ex. K. Principal Garcia contends there were seven teaching positions he proposed to require a bilingual endorsement, including Ortega's. Def. 56.1 ¶ 16; R. 92, Ex. K. In order to determine which teachers at Hedges would be impacted by Principal Garcia's proposal, WFPU conducted an analysis of the teaching staff at Hedges by reviewing the teachers' respective seniority, endorsements, certifications, and efficiency ratings. Def. 56.1 ¶ 17. The Board's WFPU reviewed Principal Garcia's staffing recommendations to determine whether any of the teachers without a bilingual endorsement whose positions had been redefined could take the position of (or "bump") a less senior teacher whose position did not require a bilingual endorsement. *Id.* ¶ 18. Based on the endorsements in Ortega's Illinois State Board of Education ("ISBE") teaching certificate, she was not qualified to take any other less senior Hedges' teacher position. *Id.* ¶ 18.

In March 2009, Ortega submitted a letter of intent to Principal Garcia that she was seeking an endorsement for "reading teacher/specialist and social science/general geography." R. 92, Ex. F. Principal Garcia did not sign the letter. Pl. Addt'l. 56.1 ¶ 19; R. 92, Ex. B at Bd. 1397-98. He contends that he denied her

request because he had "made it clear to [his] staff that the expectation by the end of the school year June 2009 [was] that all teachers must be endorsed in the area they're going to be teaching." *Id.* at Bd. 1399. Principal Garcia also declined to sign letters of intent submitted by teachers Linda Smith and Ravitha Madabushi. *Id.*

In May 2009, Gloria Trujillo-Reyes, a WFPU coordinator, determined that of the seven teacher positions that Principal Garcia defined to require a bilingual endorsement, only two teachers assigned to those redefined positions, one of whom was Ortega, would be displaced. Def. 56.1 ¶ 19; R. 92, Ex. C at 58:2-19; R. 92, Ex. FF. The Board could not staff Ortega in any pre-K through fifth grade teacher positions at Hedges because her ISBE teaching certificate only permitted Ortega to teach students in grades six to eight. Def. 56.1 ¶ 19.

Principal Garcia contends that in the spring of 2009, he realized he would not be able to staff certain positions he had designated to require bilingual endorsement or dual endorsements due to the lack of qualified applicants who held math and science endorsements. R. 104, Ex. 3 ¶¶ 3-4; Pl. Addt'l. 56.1 ¶¶ 27, 28. As a result, he permitted the school's literacy coordinator to co-teach with any teacher who had endorsements in math and science but did not have a language arts endorsement. The literacy coordinator provided language arts support that made up for the absence of the math or science teacher's language arts endorsement. R. 104, Ex. 3 ¶¶ 3-4. Principal Garcia attested that he could not offer reciprocal math and science support for teachers of other middle grade subjects because he did not have similar support personnel for those subjects. *Id.*

Subsequently, in June 2009, Ortega (along with fellow tenured teacher Diane Atkinson) was transferred to the reassigned teachers pool because she did not have the ISBE bilingual certificate to stay in her position or other ISBE certifications necessary to bump less senior teachers at Hedges. Def. 56.1 ¶ 47; Pl. Addt'l. 56.1 ¶ 28. According to the Reassigned Teachers Policy, and pursuant to the Collective Bargaining Agreement between the Chicago Teachers Union and the Board in effect in 2009, a tenured teacher who had been displaced from her position continued to receive pay and benefits as a reassigned teacher for a ten-school month period. Def. 56.1 ¶ 8. If the teacher was unable to secure a permanent appointment to a teaching position during that ten-month period, the teacher would be laid off and given an honorable termination from service. Pl. Addt'l. 56.1 ¶ 37; R. 92, Ex. HH.

Consistent with the policy, Ortega's benefits, salary and tenure status remained the same while she was a reassigned teacher. Def. 56.1 ¶ 8. Ortega was unable to secure a permanent appointment to a teaching position during her ten-month period in the reassigned teachers pool and thus, was laid off and given an honorable termination from service, effective June 19, 2010. Pl. Addt'l. 56.1 ¶ 37. In August 2010, Ortega received her social science middle school endorsement. Pl. Addt'l. 56.1 ¶ 30. Atkinson, like Ortega, filed a grievance in June of 2009, though hers was successful. R. 92, Ex. D at 34:22-35:23; R. 104, Ex. 3 ¶ 5. Atkinson returned to her position at Hedges to teach math and language arts. Pl. Addt'l. 56.1 ¶ 27. Atkinson was able to show that she had a right to return to her position after Principal Garcia could not find a bilingual candidate and had to return the position

back to being monolingual. *Id.* ¶¶ 27-28; R. 92, Ex. J at 1546-47; R. 92, Ex. B at Bd. 1396, 1445-46.

Another teacher, Justina Suh, taught eighth grade math at Hedges from 2008-09 and eighth grade math and language arts in 2009-10. While it is unclear exactly when Suh obtained her middle school endorsement in math, she did not do so until July 1, 2010, at the earliest. R. 92, Ex. GG; R. 95 at 13.

Effective September 2010, another teacher, Patricia Nagy, was assigned to teach seventh grade social studies and language arts. Nagy received a middle school language arts endorsement in January 2010 and a social science endorsement in January 2012. R. 92, Ex. DD. Nagy also submitted a letter of intent for a librarian position to Principal Garcia in 2010 for the 2010-11 school year, which he signed, but ultimately she was not staffed to a librarian position. R. 105 at 12 n. 7.

III.    **Procedural History**

On July 31, 2008, Ortega filed a grievance regarding claims of receiving excessive paper work, which did not allege disability discrimination. Def. 56.1 ¶ 54. The Board denied this grievance. *Id.* On May 9, 2009, Ortega first made an ADA complaint to the Board. Pl. Addt'l. 56.1 ¶ 38. Ortega sent Principal Garcia an e-mail stating, in part, "I am writing to inform you that you have compelled me to file a complaint under the Americans with Disabilities Act due to the harassment and discrimination that I have been subjected to. You know very well that I have a left arm paralysis." *Id.* On May 11, 2009, Joan Hill-McClain, Manager of the Board's

Equal Opportunity Compliance Office ("EOCO") office acknowledged that Ortega wished to file an ADA complaint. *Id.*

On July 17, 2009, Ortega filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Def. 56.1 ¶ 51. On July 31, 2009, Ortega filed a grievance with the Board's Office of Employee Engagement alleging that she was improperly displaced from her position. *Id.* ¶ 52. That office and an independent Arbitrator found that Ortega was properly displaced from her position at Hedges.[13] *Id.* ¶ 53.

Ortega filed this lawsuit on November 28, 2011, against the Board and Garcia. R. 1. She amended her complaint on November 27, 2012, claiming: (1) a violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq. ("Count IV"); (2) a First Amendment retaliation claim in violation of 42 U.S.C. § 1983 ("Count V"); (3) a violation of federal due process rights ("Count VI"); and (4) a violation of the Illinois Whistleblower Act, 740 ILCS 174/1, et seq. ("Count VII"), a state law claim brought under the supplemental jurisdiction provisions of 28 U.S.C. § 1367.[14] R. 37. On March 22, 2013, the Court dismissed Counts V, VI, and VII with prejudice against both Defendants, leaving her ADA claims for discrimination. R. 52.

---

[13] The Arbitration Opinion and Award attached as Defendant's Exhibit N does not contain the date of the decision. R 76, Ex. N.

[14] Ortega's amended complaint contains four counts, numbered Counts IV, V, VI, and VII. (R. 37.) It does not contain a Count I, II, or III. To avoid confusion, the Court refers to the counts as the amended complaint and parties refer to them.

Ortega alleges Defendant failed to accommodate her under the ADA when she: (1) requested assistance moving supplies in November 2007; (2) requested that Principal Garcia stop "bombarding" her with additional paperwork in January 2008; and (3) requested additional time to complete an at-risk student report in March 2009. Def. 56.1 ¶ 49. Ortega also alleges that Defendant subjected her to the following discriminatory actions in violation of the ADA: (1) no assistance moving books and supplies from November 2007 to January 2008; (2) extensive and last minute paperwork requests during the 2007-08 school year; (3) a heavy work load during the 2008-09 school year; (4) insufficient time to complete an assignment; (5) a May 2009 cautionary notice; and (6) her June 2009 displacement from Hedges. R. 76 ¶ 22. Finally, Ortega asserts that she was retaliated against for making accommodation requests and filing an ADA complaint. R. 37.

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013).

Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I.    ADA Discrimination

#### A.    Valid Comparators

As a threshold matter, Defendant disputes which employees may be considered Ortega's "comparators" for purposes of evaluating her ADA claim. "The purpose of the 'similarly situated' comparator element is to ensure that all other variables are discounted so that an inference of unlawful intent would be reasonable." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 742 (7th Cir. 2011) (reviewing Title VII discrimination claim) (citing *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). "[T]he comparators must be similar enough that any differences in their treatment cannot be attributed to other variables." *Id.*

Defendant argues without legal citation that the Court should disregard all comparators whom Ortega failed to identify in discovery. R. 105 at 6 n.3. Defendant asserts that in response to the summary judgment motion, Ortega names, for the first time, Ignacio Sanchez and Eric Siegel and they should not be considered as comparators. Defendant also asserts that Ortega named only Alejandro Perez, Justina Suh, and Jessica Guzman when asked in interrogatories and her deposition to identify alleged comparators. Ortega did not explain that they were allegedly treated better concerning endorsements, as opposed to being treated better with

respect to processing fewer grades. *Id.* While Siegel and Sanchez do not appear in Ortega's interrogatory responses, R. 105-1 at 11, their names have been previously raised in documents submitted in the briefing on summary judgment, including the arbitration hearing transcript. *See, e.g.,* R. 92, Ex. B at Bd. 1439-41. More importantly, their inclusion does not alter the Court's outcome. Additionally, with respect to Siegel, Sanchez, and the other comparators whom Defendant claims were not identified for the same comparator basis prior to summary judgment, Defendant does not articulate how it has been prejudiced by the inclusion of comparators for additional bases. Ortega included in her complaint allegations about being more qualified for the positions that opened up at Hedges during the 2009-10 school year. In its motion for summary judgment, Defendant addresses Ortega's argument that the endorsement qualifications were used as the proffered basis for discrimination against her. R. 37. For those reasons, the comparators will be included in the Court's analysis.

## B. Time-Barred Actions

Defendant argues that the alleged discriminatory actions Ortega identifies that occurred during the 2007-08 school year are time-barred. Specifically, Defendant points to Ortega's allegations that during the 2007-08 school year: (1) Principal Garcia made her process extensive and last minute paperwork while she was the Lead Literacy Coordinator; and (2) Principal Garcia did not provide her with assistance to move books and supplies. R. 75 at 5; Def. 56.1 ¶49.

In Illinois, an employee may sue under the ADA only if a charge of discrimination is filed with the EEOC within 300 days of the alleged unlawful employment practice. *See Teague v. Nw. Mem'l Hosp.*, 492 Fed. App'x. 680, 684 (7th Cir. 2012) (citing 42 U.S.C. §§ 12117(a), 2000e–5(e)(1)) ("A plaintiff in Illinois, a 'deferral state' because it has a state agency with enforcement powers parallel to those of the EEOC, must file a charge of discrimination with the EEOC within 300 days of some offending conduct."). Ortega filed her EEOC charge in July of 2009. Def. 56.1 ¶ 51, more than 300 days after Garcia allegedly imposed onerous paperwork and failed to help her move books and supplies.

The Court finds the conduct more than 300 days prior to Ortega's EEOC complaint time-barred. To the extent Ortega attempts to invoke the "continuing violation" doctrine to show her claims from the 2007-2008 school year are actionable, *see* R. 95 at 19, her argument fails. The continuing violation doctrine permits a plaintiff to delay filing an EEOC charge until a series of acts by an employer "blossoms into a wrongful injury on which a suit can be based." *Mull v. Abbott Labs.*, 563 F. Supp. 2d 925, 929-30 (N.D. Ill. 2008) (citing *Lewis v. City of Chicago,* 528 F.3d 488, 493 (7th Cir. 2008)). However, "the Seventh Circuit has made it clear that the continuing violation doctrine does not apply to 'discrete' discriminatory acts, and will only be applicable to 'acts contributing to' claims, such as a hostile work environment claim." *Slingerland v. Bibb*, No. 05 C 7253, 2006 WL 3775953, at *3 (N.D. Ill. Dec. 18, 2006) (citing *Lucas v. Chicago Transit Authority,* 367 F.3d 714, 723-24 (7th Cir. 2004) (stating that "[w]ith respect to the first

category-discrete acts-each act starts a new clock for filing charges, and the clock starts on the date that the act occurred" . . . that "[a]ny discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations"). Discrete acts are defined as acts that "'are easy to identify' because 'each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice.'" *Slingerland*, 2006 WL 3775953, at *3 (quoting *Lucas,* 367 F.3d at 724 (quoting in part *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002))).

A hostile work environment claim, by contrast, "involves repeated conduct that 'may not be actionable on its own, . . . [and][s]uch claims are based on the cumulative effect of individual acts.'" *Id.* Ortega has not made a hostile work environment claim. Nor has she argued that any of the 2007-2008 incidents are actionable. Insofar as these discrete actions occurred more than 300 days before her EEOC charge, they are therefore time-barred. Additionally, Ortega cites no authority discussing the continuing-violation doctrine in the context of a failure to accommodate claim. Courts that have analyzed the application of this doctrine in ADA lawsuits have concluded that "a refusal to accommodate is a discrete act—not an ongoing omission—and therefore the continuing violation doctrine does not apply." *See Teague*, 492 Fed. App'x at 684 (citing *Tobin v. Liberty Mut. Ins. Co.,* 553 F.3d 121, 130–31 (1st Cir. 2009); *Mayers v. Laborers' Health & Safety Fund of N.*

*Am.,* 478 F.3d 364, 368 (D.C. Cir. 2007)). Thus, the acts Ortega identifies during the 2007-08 school year more than 300 days prior to her EEOC charge are time-barred.

### C. Discrimination Claims

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Because "the motivation and implementation behind the ADA was similar to that of the Civil Rights Act of 1964, courts often look to the Civil Rights Act for ADA guidance." *Dickerson v. Bd. of Trustees of Comm. College Dist. No. 522,* 657 F.3d 595, 600 (7th Cir. 2011) (collecting cases).

There are two types of discrimination claims under the ADA: disparate treatment and failure to accommodate. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Ortega has alleged both types of discrimination.

### i. Disparate Treatment

"Disparate treatment claims arise from language in the ADA prohibiting covered entities from limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee." *Hoffman*, 256 F.3d at 572 (citing 42 U.S.C. § 12112(b)(1)). A disabled plaintiff can prove disability discrimination using either the direct or indirect method of proof. *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000). Ortega argues that Defendant is not entitled to summary judgment because

she has established a claim of disability discrimination under both the direct and indirect methods.

### a.    Direct Method of Proof

To make out a prima facie case of disability discrimination for disparate treatment under the direct method of proof, Ortega must show that: "(1) she has a disability within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she was subject to an adverse employment action due to her disability." *Herrera v. Illinois Bell Tel. Co.*, No. 11 C 5762, 2013 WL 654920, at *8 (N.D. Ill. Feb. 21, 2013) *aff'd*, 530 F. App'x 588 (7th Cir. 2013) (citations omitted). Under the direct method, Ortega may present either direct or circumstantial evidence to meet her burden. *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir. 2004). Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus. *Id.* at 503. Where direct evidence is not present, circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *See Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 586–87 (7th Cir. 2011). "Whatever circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action." *Burnell v. Gates*

*Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011) (citing *Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Ortega relies on circumstantial evidence of a causal link. She argues that a discriminatory motive for the adverse employment actions against her is inferable from the following: (1) Ortega's request for more time to complete her list of student interventions because of her left arm paralysis and Principal Garcia's response to "just get it done," R. 95 at 4; (2) other requests for help (e.g., getting materials to her classroom) and Principal Garcia's response to "get the help however she could," *id.*; and (3) Ortega's May 2009 cautionary notice. *Id.* at 4-5.

The Court finds Ortega's circumstantial evidence insufficient to demonstrate discriminatory intent for her reassignment. The circumstantial evidence she cites does not "point directly to a discriminatory reason for the employer's action." *Adams*, 324 F.3d at 939. With regard to her requests for more time to complete the student interventions lists in January or February 2009, Ortega and other teachers were all given until the end of the week to complete them. Def. 56.1 ¶ 41. Ortega has not shown how Principal Garcia's instructions to "just get it done," and his failure to give her more time than the extension she and everyone else received, are related to the proffered adverse action against her—being placed in the reassigned teachers' pool in June 2009. *See Cianci v. Pettibone Corp.,* 152 F.3d 723, 727 (noting that "before seemingly stray workplace remarks will qualify as . . . evidence of discrimination [under the direct method of proof], the plaintiff must show that the remarks were related to the employment decision in question") (citation omitted);

*see also Cerutti v. BASF Corp.,* 349 F.3d 1055, 1066 (7th Cir. 2003). The same goes for Perez's testimony that Principal Garcia told Ortega to "get help however she could" in getting materials to her classroom. Pl. Addt'l. 56.1 ¶ 17. The only date provided for that conduct is Ortega's November 2007 request to Principal Garcia for assistance moving books and school supplies. Def. 56.1 ¶ 23. Ortega fails to show that the remarks or treatment were related to her reassignment more than a year later. Additionally, Ortega received the requested assistance two months later when Principal Garcia instructed an assistant principal to create a sign-in sheet for student helpers to help all teachers with small projects. *Id.* ¶ 25.

With regard to the May 2009 cautionary notice, Ortega points to Atkinson's testimony that Ortega received the notice after she told Principal Garcia that she needed more time to complete the assignment because of her paralysis. Pl. Addt'l. 56.1 ¶ 7. Assuming that Ortega's June 2009 reassignment was an adverse action (which Defendant disputes), although it was close in time to her receipt of the May 2009 cautionary notice, timing alone will not defeat summary judgment. *Magnus v. St. Mark United Methodist Church*, No. 10 C 380, 2011 WL 5515521, at *7 (N.D. Ill. Nov. 10, 2011) ("suspicious timing alone is almost never enough" to defeat summary judgment, and those cases "where a weak inference regarding suspicious timing alone is enough to create a triable issue" are "rare") (quoting *Reynolds v. Champaign Urbana Mass Transit Dist.*, 378 Fed. App'x. 579, 582 (7th Cir. 2010)) (internal quotation marks omitted)). Further, Ortega does not dispute the sequence of events preceding the cautionary notice. On April 20, 2009, Principal Garcia first

forwarded to Ortega the letter from a student's parent about the student's language arts grade and notified Ortega that a meeting with the parent would be scheduled. Def. 56.1 ¶ 43. Principal Garcia also told Ortega to have the necessary documents to support the grade that she issued to the student ready for the meeting. *Id*. On or about April 30, 2009, Principal Garcia notified Ortega that the meeting was scheduled for May 4, 2009, and reminded Ortega that she should have all required documentation ready. *Id*. ¶ 44. At the May 4, 2009, meeting, Ortega failed to provide the supporting documents to justify the student's grades. *Id*. Principal Garcia gave Ortega additional time, until May 8, 2009, when she again failed to produce the supporting documents. *Id*. ¶ 45. Thus, while Atkinson heard Ortega tell Principal Garcia on May 8 that she could not complete the analysis because of her left arm paralysis, Ortega does not dispute the factual basis for the cautionary notice. R. 76-11, Ex. 5. In this context, Ortega has failed to show a causal link between the cautionary notice and her reassignment.

### b. Indirect Method of Proof

Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson*, 657 F.3d at 601-02 (citing *Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 601 (7th Cir. 2009)). "Once a plaintiff has established a *prima facie* case, the defendant must identify a

legitimate, non-discriminatory reason for its employment decision." *Id.* (citing *Rooney v. Koch Air, LLC,* 410 F.3d 376, 381 (7th Cir. 2005)). "If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Dickerson*, 657 F.3d at 601-02 (citing *Lloyd,* 552 F.3d at 601).

### i.     Adverse Job Action

Ortega identifies the following as adverse job actions,[15] though she fails to provide specific dates for any of them: (1) failing to give assistance in moving books and supplies; (2) extensive and last minute paperwork; (3) a heavy workload; (4) insufficient time to complete assignments; (5) the issuance of a cautionary notice upon a request for accommodation, and (6) unjustified displacement from permanent employment, all of which she describes as "examples of an unsafe and negative working environment for a Plaintiff suffering from . . . arm paralysis." R. 95 at 7. Defendant argues that none of the conduct qualifies as an adverse action because it did not quantitatively or qualitatively change the terms or conditions of Ortega's employment. Ortega argues that each of these actions falls within the category of actions where "the conditions in which [Plaintiff] works are changed in a way that subjects [her] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Herrnreiter v. Chicago Hous. Auth.,* 315 F.3d 742, 744 (7th Cir. 2002). However,

---

[15] As discussed above, to the extent these adverse job actions took place more than 300 days prior to her July 2009 EEOC claim, they are not actionable. That includes Ortega's November 2007 request for help moving supplies and Garcia's January 2008 request regarding completing additional paperwork.

with the exception of her June 2009 reassignment, Ortega fails to develop an argument (or provide examples) that any similarly situated colleagues were treated differently with respect to her proffered adverse actions. R. 95 at 7-8. Thus, the court will address only the June 2009 reassignment.

Adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) (internal quotation marks omitted)). To be actionable, an employment action "must be a significant change in employment status . . . or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (citation omitted). Adverse employment actions are often "economic injuries," *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002), but also "extend beyond readily quantifiable losses." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004) (citations omitted)).

While the Seventh Circuit takes a broad view with regard to what rises to the level of a materially adverse employment action, *Maclin v. SBC Ameritech*, 520 F.3d 781, 787 (7th Cir. 2008), a mere inconvenience or a minor change in working conditions does not qualify. *Nichols v. S. Ill. Univ.–Edwardsville*, 510 F.3d 772, 780

(7th Cir. 2007). "At the very least, [plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

The Court concludes that a reasonable jury could find that the reassignment was adverse. Ortega has presented evidence that, by its terms, the reassignment policy resulted in her being laid off as she was unable to secure another job in 10 months, which she did not. *See, e.g., Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 430 (E.D.N.Y. 2014) ("a reasonable jury could find that the transfer to the bus depot was an adverse employment action. Likewise, the rescission of [plaintiff's] reclassification, which led to her termination could constitute an adverse action. Thus, there is sufficient evidence to establish plaintiff's prima facie case for summary judgment purposes."); *Cf. Blazquez v. Bd. of Educ. of the City of Chicago*, No. 05 C 4389, 2007 WL 2410369, at *13 (N.D. Il. Aug. 20, 2007) (finding plaintiff who was displaced from her school, not invited back for the school year, but remained a Board employee with the right to be considered for other teaching positions and who almost immediately found a placement at another school, had not shown an adverse action).

### ii. Remaining Elements

Ortega contends that other teachers who were similarly situated to her were treated more favorably with respect to the alleged adverse action. In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the

individual is "directly comparable to her in all material respects." *Burks v. Wisconsin Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). "Factors relevant to this inquiry include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualifications." *Burks*, 464 F.3d at 751 (citations omitted). This also requires the plaintiff to show that there were no "differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them." *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir. 2005) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

Ortega claims that teachers Ignacio Sanchez, Diane Atkinson, Eric Siegel, and Justina Suh were all treated better than she was because their bilingual endorsement requirements were waived. R. 95 at 9. Ortega also argues that Alejandro Perez, Brian Cerda, Patricia Nagy, Jessica Guzman, Justina Suh, and Diane Atkinson were treated better with respect to the middle grades specialization policy, which required teachers to obtain a content area endorsement. *Id.* at 13.

Ortega has failed to show that she was similarly situated to the majority of the teachers at the time of her reassignment. In some cases, the other teachers that either had bilingual endorsements (or their equivalent) or were endorsed in subject matters other than language arts during the relevant time period. While Ortega received her language arts endorsement in January 2009, she did not receive her social science endorsement until August 2010. R. 92, Ex. Y. In June 2009, however,

Sanchez had endorsements in both language arts and math, the latter of which Ortega did not. R. 92, Ex. Z. Similarly, Siegel, who taught language arts and social studies, was endorsed in both of those subjects in July 2009. *Id.*, Ex. W. Brian Cerda, who taught sixth grade language arts and social studies during the 2009-10 school year, had endorsements in both language arts and social science, initially issued in August of 2006 and renewed in July 2010. Pl. Addt'l. 56.1 ¶ 33; R. 92, Ex. KK. As noted, Principal Garcia decided that it was most efficient for the 2009-10 school year to staff his sixth grade program as he had the seventh and eighth grade programs—requiring three teachers to teach two subject matters. *See, e.g., Barbarotta v. Chicago Bd. of Educ.*, No. 05 C 3241, 2008 WL 4671745, at *6 (N.D. Ill. Oct. 21, 2008) (finding teacher not similarly situated to plaintiff where the alleged comparator had the same number of ISBE certificates, but possessed certificates of different kinds that qualified him for the principal's requirement that "the Spanish language teachers should have an additional endorsement in another core subject.").

Ortega was also not similarly situated to Perez and Guzman. They had bilingual endorsements or were otherwise properly certified to teach classes requiring a bilingual certificate, which Ortega was not. R. 104, Ex. 2 ¶ 4, Attachment A; R. 92, Ex. T. As noted, in February 2009, Principal Garcia had determined based on student test scores from the bilingual program and the increased number of students in the program that his school needed more teachers with a bilingual endorsement. Def. 56.1 ¶ 13. Guzman taught eighth grade social

science in 2008-09 and was assigned to teach eighth grade social science and language arts for the 2009-10 year. Pl. Addt'l. 56.1 ¶ 35. Although Guzman did not have her endorsement for social science and obtained her bilingual endorsement in January 2011, she was issued a transitional bilingual teaching certificate in May 2004 which expired on July 1, 2011. R. 104, Ex. 2 ¶ 4, Attachment A; R. 92, Ex. T. According to the Employee Relations Manager of the Board's Office of Human Capital, Alicia Reynaud, that transitional bilingual certificate enabled Guzman to teach classes requiring a bilingual certificate and was equivalent to a bilingual endorsement. R. 104, Ex. 2 ¶ 4. In the 2008-09 school year, Perez was teaching language arts and math, which he was also assigned to teach in 2009-10. Unlike Ortega, Perez had a math endorsement and a bilingual endorsement. R. 92, Ex. T. Accordingly, even if Guzman and Perez taught only the same subject as Ortega— language arts—they each also had a bilingual endorsement qualifying them in a way that Ortega was not. *Barbarotta*, 2008 WL 4671745, at *6. Ortega asserts that she obtained her junior high school foreign language-Spanish endorsement in 2002 and an ESL endorsement in 2010, Pl. Addt'l. 56.1 ¶ 30, but provides no support for the assertion that these were equivalent to a bilingual endorsement.

Atkinson, like Ortega, did not have a bilingual endorsement. After Atkinson's grievance was resolved in November 2010, she taught math and language arts. Pl. Addt'l. 56.1 ¶ 27. She was not treated better than Ortega, however, with respect to the June 2009 reassignment because she too was placed in the reassignment pool with Ortega at that time. However, Atkinson was able to show that she had a right

to return to her position after Principal Garcia could not find a bilingual candidate to fill it. Def. 56.1 ¶ 48. Even if the Court considers Atkinson's return to Hedges following her grievance as better treatment in the context of her displacement, Atkinson's junior high math endorsement meant she was not similarly situated to Ortega. Unlike Ortega, she possessed credentials allowing her to teach math in the middle grades. R. 104, Ex. 3; R. 92, Ex. V. Further, Principal Garcia explained that due to a lack of qualified applicants who held endorsements in math and science, he determined the school's literacy coordinator would co-teach language arts with any teacher who had endorsements in math and science. R. 104, Ex. 3 ¶ 3.

Ortega claims that she has established pretext because Defendant changed its business justification for her reassignment. R. 95 at 1-2. Ortega asserts that "Principal Garcia claims that he submitted a proposal to redefine a total of seven teaching positions to require a bilingual endorsement, one of which was Plaintiff's 6th grade teaching position," and that, according to the principal, Ortega "simply did not have the certificates or endorsements to 'bump' other less senior teachers." *Id.* She claims that this justification "must be contrasted" with Principal Garcia's claims made during the arbitration of Ortega's displacement. She argues that "[a]t arbitration, Principal Garcia and the Board of Education took the position that Plaintiff was displaced because of the middle school specialization policy, which has nothing to do with whether Plaintiff had a bilingual endorsement." *Id.* Ortega further asserts that "[t]his change in 'justification' was necessary because of the admission by the Board during this case that Principal Garcia actually had no

discretion to disallow a short term authorization request, which would have permitted Plaintiff to comply with the terms of the middle school specialization policy." *Id.* Instead, Ortega claims, Principal Garcia denied her request for a short term authorization to use lack of a "proper endorsement" as a means to displace her.

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Where a defendant offers multiple reasons for an adverse action, a plaintiff must present evidence that they were all pretextual to defeat a motion for summary judgment. *See, e.g., Burks*, 464 F.3d at 754 (reviewing bases for termination). Accordingly, Ortega is still required to submit evidence from which a reasonable jury could find that each of Defendant's reasons for transferring her to the reassigned teachers' list was pretextual.

Given that an employer can terminate an employee for multiple, legitimate reasons, the fact that a record contains more than one statement of why a plaintiff was fired only helps the plaintiff if those statements "are inconsistent with one another or the underlying facts in such a way as to suggest a lie." *Creal v. Springhill Ford, Inc.*, No. 06 C 0175, 2007 WL 3120106, at *6 (N.D. Ill. Oct. 19, 2007). Ortega has not shown that the justifications of Principal Garcia and the Board at arbitration were inconsistent with Principal Garcia's proffered reasons relating to the bilingual endorsement requirement. In her attempt to support this proposition, Ortega cites her three-page long response to one of Defendant's

statement of facts, ¶ 13. R. 95 at 1-2. The Court has already found that response to be improper. In any case, the record evidence cited therein does not support Ortega's position. Ortega cherry picks from the explanations provided to suggest that they must be mutually exclusive.

Contrary to Ortega's claim that the bilingual basis was not relied upon at arbitration, both Principal Garcia and Trujillo-Reyes testified about the bilingual requirement *in addition* to endorsements during the arbitration hearing. Principal Garcia testified at arbitration that the middle grades policy required extensive research and programming for the 2009-10 school year. R. 92, Ex. 2 at 1393. He stated that ten positions were affected by the middle grades specialization policy. *Id.* During the same testimony, when asked what precluded Ortega from remaining at Hedges at the end of the 2008-09 school year, Principal Garcia stated that she "did not comply with social studies and bilingual." *Id.* at 1412. Ortega fails to show how this is inconsistent with the justification that certain positions were redefined to require a bilingual endorsement, including her own. When questioned at arbitration about why Ortega did not qualify for the ten positions affected by the middle grades specialization policy, WFPU coordinator Trujillo-Reyes cited, among the lack of other endorsements, Ortega's lack of a bilingual endorsement for positions filled by other teachers. *See* R. 92, Ex. B at Bd. 1441:20-1442:2, 1443:4-1444:2. That testimony belies Ortega's claim that Defendant changed its business justification for her displacement.

With respect to Ortega's claims about the short term authorization, she notes that Trujillo-Reyes testified during her September 2013 deposition that principals do not have a choice on who *approves* the short-term authorization, which lies with "the Department at the Board." R. 92, Ex. C at 13:5-10 (emphasis added). However, at the September 2010 arbitration, Trujillo-Reyes also testified that principals have discretion to sign a letter of intent for a short term authorization request, which is then passed onto the Board for approval. Specifically, Trujillo-Reyes testified that the process for a short-term authorization was for a teacher to go to the ISBE to find out their deficiencies, and if they did not have an endorsement, apply for a short-term authorization. R. 92, Ex. B at Bd. 1429. That application required them to fill out two forms, one of which the principal "could sign off" to move the authorization application onto the Board. *Id.* at Bd. 1430. The principal was not required to sign off, but had discretion to do so. Ex. B at Bd. 1430-1432.

This is consistent with the declaration of Tinesha Woods, the project manager in the Board's Office of Instructional Design and Assessment, who was assigned to develop a rollout plan for the Board's middle school specialization policy and who oversaw the short term authorization process related to the policy. R. 104, Ex. 1 ¶ 4. According to Woods, teachers who lacked a content area endorsement could submit an application for short term authorization to the Office of Instructional Design and Assessment. *Id.* In order for the application to be processed, the teacher's principal or the principal's proxy needed to sign the letter of intent, which they had discretion to do. *Id.*

Principal Garcia testified at arbitration that he informed the staff during the 2008-09 school year that he expected them to be endorsed by the end of the school year in one or more of the core subjects. R. 92, Ex. B at Bd. 1392:1-23. He also testified that he did not sign off for approval of short term authorizations for Linda Smith or Ravitha Madabushi, in addition to Ortega, *id.* at Bd. 1399:1-1400:1, because he had made it clear to the staff that he expected them to be endorsed in the area they would be teaching and believed he had the discretion to sign off or not on the authorization. R. 92, Ex. B at Bd. 1399:7-20. Ortega's related pretext argument—that Principal Garcia did not sign her letter of intent in order to use her lack of a "proper endorsement" against her—therefore fails.

There are two teachers, however, whom the Court finds were similarly situated to Ortega. Justina Suh taught eighth grade math at Hedges from 2008-09 and eighth grade math and language arts in 2009-10. Principal Garcia explained that he had to alter his staffing to accommodate the shortage of qualified applicants with dual endorsements by using the literacy coordinator to co-teach language arts with math and science teachers who lacked that endorsement. Pl. Addt'l. 56.1 ¶ 27; R. 104, Ex 3 ¶ 3. But Ortega notes (and Defendant does not dispute) that Suh did not obtain her middle school endorsement in math until July 1, 2010. R. 92, Ex. GG. Suh's credentials report, however, shows only a middle grades math endorsement issued on July 1, 2012. *Id.* In its reply, Defendant fails to clarify when Suh received her math endorsement. In either case, it does not appear that Suh held the math endorsement until after the school year in 2010, although she taught math and

language arts during the 2008-09 and 2009-10 school years. Based on the date of her math endorsement, Defendant's proffered distinction between Suh and Ortega—that Ortega "lacked a mathematics endorsement," R. 105 at 9—appears to be inaccurate, or at least requires more explanation. The Court finds that Defendant has failed to identify a legitimate, non-discriminatory reason for its employment decision to treat Ortega differently than Suh.

Defendant also fails to effectively dispute that Patricia Nagy was similarly situated to Ortega. Defendant has not identified a legitimate, non-discriminatory reason why she was treated more favorably than Ortega. Effective September 2010, Nagy was assigned to teach seventh grade social studies and language arts. Pl. Addt'l. 56.1 ¶ 34. Ortega argues that Nagy did not receive her language arts endorsement until January 2010, and her social science endorsement until January 2012, both after Ortega, respectively. R. 92, Ex. DD. While Defendant claims that Nagy was not similarly situated because Nagy had a bilingual endorsement, her attached credential report states that her bilingual endorsement was for kindergarten through fourth grades, not middle school. *Id.* The transitional bilingual teaching endorsement on that report states that it expired in July 2004. *Id.* Neither party addresses that issue.

Defendant also states that Nagy, who submitted a letter of intent for a librarian position to Principal Garcia in 2010, is not similarly situated to Ortega "because Plaintiff offers no evidence that she either applied for a Librarian position at Hedges or asked Principal Garcia to sign a letter of intent for a Librarian

position." R. 105 at 12 n.7. However, even though Principal Garcia signed a letter of intent for Nagy in 2010 for a librarian position, she was not staffed to a librarian position. R. 105 at 12 n.7; R. 104, Ex. 3 ¶ 7. Defendant fails to explain the relevance of this fact to Ortega's endorsement status—bilingual or otherwise—at the time she was reassigned in June 2009 or finally terminated from service in June 2010.

In sum, the Court finds that Ortega's ADA discrimination claim for disparate treatment survives summary judgment only with respect to comparators Justina Suh and Patricia Nagy, for whom Defendant has failed to identify a legitimate, non-discriminatory reason for its employment decision in allowing them and not Ortega to teach without certain endorsements.

### ii.     Failure to Accommodate under the ADA

The second type of discrimination under the ADA is for failure to accommodate, which arises from language in the ADA requiring employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). The Seventh Circuit has derived a three-part test from the statutory language for failure to accommodate. "In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) [s]he is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). In failure to accommodate claims, unlike disparate treatment claims, the *McDonnell Douglas*

burden-shifting approach is not necessary or appropriate. *See Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997). Instead, the plaintiff, in addition to showing that she is a qualified individual with a disability, must show that the employer was aware of her disability and still failed to reasonably accommodate it. *Hoffman*, 256 F.3d at 572-73 (citing *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999)).

Reasonable accommodations may include: "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Hoffman*, 256 F.3d at 573; 42 U.S.C. § 12111(9)).

In her response brief, the entirety of Ortega's argument section regarding Defendant's failure to reasonably accommodate her is as follows:

> Principal Garcia was required to accommodate Plaintiff's disability, which he did not do. Testimony was clear that Plaintiff requested accommodation from Garcia and that these requests were ignored. Principal Garcia wanted everything done on his own schedule, regardless of Plaintiff's disability.

R. 95 at 17. Ortega fails to develop her argument that defendant failed to reasonably accommodate her disability. In her argument about disparate treatment, she alleges that Defendant failed to accommodate her requests, as follows: (1) November 2007 request to provide her with a reasonable accommodation to move

books and school supplies; (2) January 2008 request to "stop bombarding her" with additional paperwork; and (3) March and May 2009 requests for more time to complete an assignment. Def. 56.1 ¶ 39; R. 95 at 15-16.[16] To the extent that Ortega relies on this conduct for failure to accommodate, her argument fails. The first two requests are time-barred, as they occurred more than 300 days prior to Ortega's EEOC complaint. *See Herr v. City of Chicago*, 447 F. Supp. 2d 915, 918 (N.D. Ill. 2006) (300 day period applies to claims brought under the ADA as well as under Title VII) (citation omitted).

With regard to the third request, Ortega alleges that in January or February 2009, she requested more time to complete her list of student interventions. Pl. Addt'l. 56.1 ¶ 15. In her response, Ortega does not state how much extra time she requested from Principal Garcia or whether that amount of time was different from the other teachers. It is undisputed, however, that all the teachers asked for more time, and Principal Garcia gave them until the end of the week. Def. 56.1 ¶ 41; Pl. Addt'l. 56.1 ¶ 15. "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000); *see also Schmidt v. Methodist Hosp. of Ind.*, 89 F.3d 342, 344 (7th Cir. 1996) (stating that "[r]easonable accommodation does not require an employer to provide literally everything the disabled employee requests"); *Hoffman*,

---

[16] While Ortega also asserts that Principal Garcia assigned her a larger number of grades to process in 2008-2009 and a report longer than those similarly situated to her, R. 95 at 16, she fails to identify any facts in support of this contention and it will not be considered.

256 F.3d at 577. Ortega also contends that Perez heard her ask Principal Garcia for more time to complete her intervention list due to her disability and he told her to "just get it done." Pl. Addt'l. 56.1 ¶ 16; R. 95 at 4. Ortega does not state when this conversation took place—before or after the other teacher requests—or how much additional time she asked for.[17] Moreover, she acknowledges that she and all of the other teachers asked Principal Garcia for more time and he gave them to the end of the week. On these facts, the Court holds that a reasonable jury could not find that Principal Garcia's grant of an extension until the end of the week was unreasonable.

## II.    ADA Retaliation

The ADA also prohibits employers from retaliating against employees who assert their rights under the Act to be free from discrimination. 42 U.S.C. § 12203(a). Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Squibb v. Mem'l Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007). "The ADA provision that forbids an employer to retaliate against an employee for statutorily protected activities is materially identical to the provision of Title VII that prohibits retaliation." *Anderson v. The Foster Group*, 521 F. Supp. 2d 758, 788 (N.D. Ill. 2007) (citing *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003)). Like her discrimination claim, Ortega may prove her claim of retaliation in violation of the ADA via either

---

[17] To the extent Ortega relies on her May 2009 request for more time which resulted in the cautionary notice, R. 95 at 16, the same analysis applies and the same conclusion results. Ortega does not dispute the sequence of facts preceding the cautionary notice nor does she state how much additional time she requested.

the direct or indirect method of proof. *Anderson*, 521 F. Supp. 2d at 788 (citing *Burks*, 464 F.3d at 758). Ortega has elected to use the direct method, R. 95 at 17, which requires her to show (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse action; and (3) a causal connection between the two. *Casna v. City of Loves Park,* 574 F.3d 420, 426 (7th Cir. 2009).

Ortega alleges that she engaged in statutorily protected activity by "request[ing] accommodation from 2007 through 2009" and, in May 2009, by placing Defendants on notice that she was filing an ADA complaint. R. 95 at 17. She asserts that her placement in the reassigned teacher's pool, which ultimately resulted in the loss of her job, was an adverse job action. *Id.* A plaintiff can establish a causal link between her protected activity and her termination using either direct or circumstantial evidence. *See Dickerson*, 657 F.3d at 601. "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus." *Id.* Ortega has not cited any direct evidence supporting this claim. The type of circumstantial evidence that Ortega may produce to survive summary judgment includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson*, 657 F.3d at 601; *see also Sneed v. City of Harvey*, 6 F. Supp. 3d 817, 834 (N.D. Ill. 2013) (*aff'd sub*

*nom. Sneed v. City of Harvey, Ill.*, No. 14-1125, 2015 WL 151715 (7th Cir. Jan. 13, 2015)).

### A.   Adverse Action

Ortega asserts that the adverse action at issue here is her assignment to the reassigned teachers' pool, which took place in June 2009. The Court has already concluded that a reasonable jury could find that Ortega's reassignment was an adverse action in support of a discrimination claim. Further, the standard for establishing retaliation pursuant to Title VII is "lower than that required for a discrimination claim; a plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Chaib*, 744 F.3d 974, 986-87 (7th Cir. 2014) (citing *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted)). Thus, for the reasons articulated in the Court's discussion of Ortega's disparate treatment claim, a reasonable jury could find that Ortega's reassignment would cause a "reasonable worker" to be dissuaded from making or supporting a charge of discrimination.

### B.   Causal Connection

Ortega asserts that a causal connection between her protected activity and "Defendants' decision to reassign [her], or at the very least, not to return [her] to Hedges—as Diane Atkinson had been returned,"[18] R. 95 at 18, can be inferred.

---

[18] In her two-page discussion of retaliation, Ortega initially identifies her reassignment as the adverse job action for the basis of her retaliation claim. R. 95 at 17-18 ("Plaintiff was displaced because she asked Principal Garcia for an

46

Ortega relies on the following circumstances: (1) the timing of her reassignment at Hedges within one month of her ADA complaint; (2) Principal Garcia's animosity towards her regarding the completion of assignments and his failure to accommodate Ortega;[19] (3) Principal Garcia's refusal to sign off on Ortega's short term authorization request; (4) the more favorable treatment of coworkers with respect to the purported endorsement requirements; and (5) Defendant's purported business justifications over time depending upon the adjudicative/investigative forum.[20] R. 95 at 18.

There is no question that Ortega engaged in protected activity in May 2009, and that Defendant was aware of that activity. For reasons articulated in the

---

accommodation"). Ortega subsequently suggests that she believes the failure to "return her" was also an adverse action, stating that her alleged protected activity was "at the very leas[t]" a substantial or motivating factor in Defendant' decision not to "return her" to Hedges, as Diane Atkinson had been "returned." R. 95 at 18.

Courts have found that the failure to rehire or reappoint constitutes an adverse employment action under Title VII, *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) (finding that plaintiff suffered adverse employment action when he was not reappointed as a professor). However, Ortega states that Defendant mischaracterizes her claim into one for failure to rehire— conceding that she does not bring such a claim—because she was not fired in 2009. While Ortega claims that she should have been "returned" to Hedges, she fails to articulate or develop a legal basis for that argument or a failure to rehire claim. It is not this court's role to develop the argument for her. *Williamson v. Astrue*, No. 08 C 3906, 2010 WL 2858834, at *12 (N.D. Ill. July 16, 2010) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (noting that "arguments that are unsupported by pertinent authority, are waived")).

[19] Ortega fails to specify what alleged "animosity" she refers to.

[20] As discussed above, *supra* at 35-39, analyzing Defendant's business justifications, the Court finds this argument unavailing.

Court's discussion of Ortega's disparate treatment discrimination claim, however, the Court finds that Principal Garcia's refusal to sign off on Ortega's short term authorization request,[21] and the purported inconsistencies in Defendants' business justification do not support an inference of a causal connection between her protected activity and adverse action against her. The Court also finds that Ortega's arguments that Principal Garcia's alleged "animosity" towards her regarding the completion of assignments and his failure to accommodate Ortega do not sufficiently support a causal link.[22] Principal Garcia placed demands on other teachers, as well, "especially the sixth grade teachers, and he would not give the teacher leeway on trying to get things done." Def. 56.1 ¶ 42. Additionally, Ortega

---

[21] While Principal Garcia signed a letter of intent for Patricia Nagy in 2010 for the 2010-11 school year, it was for different position (Librarian). R. 105 at 12 n. 7. However, there is no evidence that Garcia signed letters of intent to teach during the 2009-10 school year. R. 104, Ex. 3 ¶ 7. He did, however, decline two other teachers' requests along with Ortega's request in 2009. R. 92, Ex. B at Bd. 1399. Additionally, Ortega offers no evidence that she either applied for a Librarian position at Hedges or asked Principal Garcia to sign a letter of intent for a Librarian position.

[22] The Court is not persuaded that Ortega's "requests for accommodation from 2007-2009" alone, all of which took place prior to her ADA complaint, provide sufficient support, to infer cause for her June reassignment. *See supra*, discussing Ortega's circumstantial evidence of a causal link for disparate treatment at 26-28. Specifically with respect to those requests for accommodation that the Court did not consider in analyzing Ortega's disparate treatment claim as time-barred—Ortega's November 2007 request to Garcia for assistance moving books and school supplies and Garcia's January 2008 requests for additional information from Ortega regarding her work as literacy coordinator—the Court is not persuaded that they are sufficiently close in time to infer causation. *See, e.g., Turner v. The Saloon, Ltd.,* 595 F.3d 679, 687 (7th Cir. 2010) (noting suspicious timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim and that more than half a year separating complaints and plaintiff's dismissal was "far too long" to withstand summary judgment).

received more time to complete her list of student interventions as did all the other teachers. Def. 56.1 ¶ 41; Pl. Addt'l. 56.1 ¶ 15.

With respect to suspicious timing, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." *Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012) (citing *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (citation omitted)). Ortega made her ADA complaint to the Board on May 9, 2009. She claims that Principal Garcia sent his "recommendations" to Trujillo-Reyes regarding reassignments, including her own, on May 30, 2009, the date listed on the HR Activity Profile form. R. 92, Ex. K. Defendant claims this does not refute Principal Garcia's statement in his declaration that he in fact decided to redefine Ortega and other non-disabled teachers' positions to require a bilingual endorsement in February 2009, months before her May 2009 complaint. Ortega failed to properly dispute this fact, responding without citation that she could not admit or deny it. In his affidavit, Principal Garcia states that he had to wait until mid-April/early May 2009 to submit his position redefinition recommendations to the Work Force Planning Unit, R. 76, Ex. K ¶ 12, and ultimately submitted seven teaching positions that required a bilingual endorsement. However, he does not state why he had to wait or provide an exact date or identify any other record evidence reflecting when he submitted those

recommendations to the WFPU.[23] In light of that, a genuine issue of material fact exists as to when he made the decision and submitted the list to the WFPU.

The Court finds that through evidence of more favorable treatment with regard to endorsements of similarly situated teachers Patricia Nagy and Justina Suh together with the temporal proximity of Ortega's May 2009 ADA complaint and June 2009 placement to the reassigned teachers pool, Ortega has presented sufficient evidence from which a reasonable jury could find that Defendant took an adverse action against her because she engaged in protected activity. *Simpson v. Beaver Dam Cmty. Hospitals, Inc.*, 780 F.3d 784, 790 (7th Cir. 2015). Summary judgment on her retaliation claim is therefore denied.

## Conclusion

For the reasons stated, Defendants' motion for summary judgment, R. 74, is granted with respect to Ortega's ADA failure to accommodate claims and denied with respect to her disparate treatment and retaliation claims. The parties are directed to contact the Court to schedule a status within 30 days of this Order.

ENTERED:

*Thomas M. Durkin*

Thomas M. Durkin
United States District Judge

Dated:  June 30, 2015

---

[23] In her deposition, Trujillo-Reyes testified that the 5/30/2009 date at the bottom of the HR Activity Profile form reflected "the date that this report was run," but there is no testimony establishing when she received Garcia's recommendations. R. 92, Ex. C at 57:15-58:1.