# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA ORTEGA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 11 C 8477 |
| vs. | ) | Judge Thomas M. Durkin |
| | ) | |
| CHICAGO BOARD OF EDUCATION, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

Linda Ortega was a tenured teacher in the Chicago Public School ("CPS") system. She taught fifth grade at Hedges Elementary until the principal of that school terminated her after determining she no longer met the requirements for her position. Ortega brought this lawsuit alleging intentional discrimination by the principal and her employer, the Chicago Board of Education ("the Board"), in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-117. Summary judgment was entered in favor of the principal because the ADA provides a right of action against the employer but not the employee's supervisor. Ortega's discrimination claims against the Board went to trial on October 13-16, and 19, 2015, and the jury returned a verdict in Ortega's favor, awarding her $285,000 in compensatory damages.[1]

---

[1] The Court directed a verdict against Ortega on her related retaliation claim against the Board.

Following the jury's verdict, the parties appeared before the Court on numerous occasions to address disputes over the equitable relief, if any, to which Ortega might be entitled as a result of the jury's finding of intentional discrimination. On August 15, 2016, the Court held a hearing to allow the introduction of additional evidence on the equitable relief question. After careful consideration of the evidence introduced at the equitable relief hearing, as well as the evidence submitted at trial and the legal briefs filed thereafter, the Court now concludes that Ortega is entitled to equitable relief in the form of back pay, prejudgment interest, front pay, and lost pension benefits, as more fully set forth below.

## GOVERNING PRINCIPLES

The ADA incorporates the remedies available to a plaintiff in a Title VII discrimination action. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 1981a(a)(2). Those remedies include compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). For employers such as the Board (more than 500 employees), compensatory damages are capped at $300,000, although the jury is not informed of this cap. *See* 42 U.S.C. § 1981a(b)(3)(D), § 1981a(c)(2). The jury's $285,000 compensatory award is within the statutory cap, and is not before the Court in this opinion. Instead, the issue to be decided is whether Ortega is entitled to one or more of the remedies specifically excluded from the jury's compensatory award, namely, "back pay, interest on back pay, or any

other type of relief authorized under . . . [42 U.S.C. § 2000e-5(g)]." 42 U.S.C. § 1981a(b)(2).

Back pay and other forms of equitable relief are available in an ADA case, *see* 42 U.S.C. § 1981a(a)(2); 42 U.S.C § 2000e-5(g)(1), but the decision of whether to award them is reserved for the trial court. *See Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000). When making that decision, the trial court "must respect the findings implied by the jury's verdict," *id.*, but is otherwise vested "with broad discretion to fashion a remedy for unlawful discrimination," *E.E.O.C. v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1580 (7th Cir. 1997). The guiding principle in exercising that discretion is that the court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (internal quotation marks and citation omitted). "And where a legal injury is of an economic character, [t]he general rule is, that . . . [t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Id.* at 418-19 (internal quotation marks and citation omitted); *see also Ford Motor Co. v. Equal Emp't Opportunity Comm'n*, 458 U.S. 219, 230 (1982) (the statutory aim is "to make the victims of unlawful discrimination whole by restoring them, so far as possible . . . to a position where they would have been were it not for the unlawful discrimination") (internal quotations and citation omitted).

## BACK PAY

### A.    OVERVIEW

"Complete relief for a victim of discrimination generally will include an award of back pay; indeed, such an award is presumptively proper once a violation has been shown." *Ilona of Hungary, Inc.,* 108 F.3d at 1580 (citing *Equal Emp't Opportunity Comm'n v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 880 (7th Cir. 1994), and *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir. 1988)). Back pay represents the wages the plaintiff would have earned had she not been fired. *See* 7th Cir. Pattern Civil Jury Instruction 3.11 (2015). Included in this calculation are any "benefits [s]he would have received from the Defendant if [s]he had not been [terminated]." *Id.*

Ortega seeks an award of net lost wages through August 15, 2016[2] and prejudgment interest in the total amount of $363,413.43. *See* R. 178 at 7. In addition, Ortega seeks lost pension benefits in the amount of $433,222.00, representing the estimated present value of the total monthly teacher's pension payments she could have anticipated receiving beginning at age 62 had she not been terminated. *See* R. 180 at 3.[3] The total amount of the back pay award

---

[2] Both parties provide back pay calculations through August 15, 2016, the date of the equitable relief hearing. The Court addresses the appropriate ending date for the back pay calculation later in this opinion.

[3] Ortega originally indicated that, in addition to pension amounts, she would be seeking compensation for lost health benefits and vacation time. R. 157 at 2-3. But the evidence introduced at the equitable relief hearing showed that those other benefits would be accounted for in the calculation of lost wages. *See* R. 184 at 53-54. Ortega has not pursued the issue and the Court therefore assumes she has

requested by Ortega is $769,635.43.[4] She also asks for an additional unspecified amount to reflect back pay from the date of the equitable relief hearing through the date judgment is entered.[5]

The Board argues, on the other hand, that Ortega's entitlement to back pay should be limited in two respects: first, by her failure to mitigate her damages; and, second, by a stipulation to a back pay amount to which the parties agreed during the trial. The Board has been inconsistent about whether it is seeking to impose both of these limitations at the same time, and its most current position on that question remains unclear. In addition, the Board takes issue with Ortega's calculation of net lost wages, and further argues that Ortega should not recover any prejudgment interest because of her purported delay in this litigation. Taking these arguments into account, the Board provides the Court with three back pay options. First, the Board suggests that Ortega is entitled to net lost wages only through

---

withdrawn any request previously made for a separate award to reflect these additional benefits.

[4] Ortega does not ask for a tax-component award to offset the increased tax burden she might incur as a result of receiving a lump sum back pay award. *See Equal Emp't Opportunity Comm'n v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme."); *see also Washington v. Office of the State Appellate Defender,* 2016 WL 5233563, at *4 (N.D. Ill. Sept. 22, 2016*); Gracia v. Sigmatron Int'l, Inc.,* 130 F. Supp. 3d 1249, 1264-65 (N.D. Ill. 2015), *aff'd,* 842 F.3d 1010 (7th Cir. 2016). Therefore, that issue has been waived. *See Smith v. Farmstand,* 2016 WL 5912886, at *25 (N.D. Ill. Oct. 11, 2016).

[5] Entry of judgment has been delayed following the jury's verdict by, among other things, the parties' protracted wrangling over the equitable relief issues in the case. The question of delay is specifically raised by the Board and will be addressed later in this opinion.

June 19, 2012 (the date on which she allegedly stopped mitigating her damages) in the amount of $33,335, to which the Board would add $2,333.45 in lost pension contributions, for a total back pay award of $35,668.45. R. 179 at 7. In what the Court will assume is an alternative calculation, the Board argues Ortega is entitled to the stipulated amount of $215,835 in back pay, although the Board is unclear whether it believes the stipulated amount is subject to further deductions.[6] If the Court rejects either of these positions, the Board argues Ortega is entitled to net lost wages through August 15, 2016 in the amount of $254,022.05, to which the Board would add $17,781.54 in lost pension contributions, for a total back pay award of $271,803.59. R. 179 at 7; R. 179-1 at 2.[7]

The Court will begin by reviewing the evidence regarding Ortega's job history. The Court then will address the Board's affirmative defense of failure to mitigate, followed by the Board's argument that the parties' trial stipulation serves to limit the amount of Ortega's back pay award. Next, the Court will resolve disputed issues related to the net lost wages calculation and prejudgment interest

---

[6] The Board's most recent filing seems to suggest no further deductions. *See* R. 179 at 1. In an earlier filing, however, the Board deducted Ortega's actual earnings and her alleged failure to mitigate from the stipulated back pay damages, to arrive at $77,982 as the purported amount to which Ortega was entitled to recover in net lost wages. *See* R. 155-1 (Exhibit A). The Board then added $5,458.74 in lost pension contributions without explaining where that figure came from, for a total suggested back pay award of $83,440.74. *Id.; see also* R. 163 at 3, ¶ 4b.

[7] The Board previously represented that the largest amount to which Ortega would be entitled is $215,835 in net lost wages plus $15,108.45 in lost pension benefits for a total of $230,943.45. *See* R. 163 at 3 n.4. The Board's current calculations for its "worst case" scenario are slightly higher than these earlier figures, as logically they should be because the current numbers represent back pay through a later date.

on net lost wages.[8] The Court will conclude the back pay issue by discussing whether Ortega is entitled to an additional award representing back pay and prejudgment interest through the date on which judgment is entered. The Court will reserve the issue of pension benefits until the end of this opinion.

## B. ORTEGA'S JOB HISTORY

Ortega began her employment with the Board on January 26, 1998. R. 139 at 79 (Tr. Transcript 143); R. 184 at 40-41; Def. Ex. X.[9] She was removed from her teaching position at Hedges Elementary on June 19, 2009. Because she was a tenured teacher, after her removal Ortega was placed in the reassigned teacher's pool for one year. The reassigned teacher's pool is a benefit given by the Board to tenured teachers who lose their job. *See* R. 141 at 82 (Tr. Transcript 650). During her time in the reassigned teacher's pool, Ortega received full pay (approximately $71,958 per year, R. 139 at 122, 127-28 (Tr. Transcript 186, 191-92)), while applying for open teaching positions and working for the Board as a substitute teacher. *Id.* at 122-27 (Tr. Transcript 186-91).

On June 19, 2010, Ortega moved from the reassigned teacher's pool to the substitute teacher's cadre. The substitute teacher's cadre is the second-year benefit given to a tenured teacher who has not found another teaching position after

---

[8] Prejudgment interest is only available on the lost wages portion of the back pay award. *See Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (7th Cir. 1987) ("interest is not available on lost future wages and pensions; the time value of money is taken into account when these are discounted to present value").

[9] Exhibit references are to documents that were admitted at the August 15, 2016 equitable relief hearing.

spending one year in the reassigned teacher's pool. The pay of a cadre substitute teacher is substantially less than the pay of a reassigned teacher. If a teacher's time in the cadre is up and she still has not been appointed to a permanent position, her employment with the Board is terminated. R. 141 at 127-29 (Tr. Transcript 191-93). Ortega supplemented her income as a cadre substitute teacher with a job as a part-time professor at City Colleges of Chicago. *Id.* at 167-68 (Tr. Transcript 231-32). Her employment with the Board ended altogether sometime in 2011. *See* R. 184 at 165.[10]

For more than a year after her final separation from the Board, the only income Ortega received was her part-time City Colleges salary and unemployment compensation. R. 139 at 173-74 (Tr. Transcript 237-38). In May 2013, she was offered and accepted a job as a human services caseworker with the State of Illinois. Initially, she received a trainee salary of $38,000 per year, which then increased to $48,000 per year. *Id.* at 174-75 (Tr. Transcript 238-39); R. 184 at 165.

The following is a summary of Ortega's job history:

| Date | Employer | Income |
|------|----------|--------|
| January 26, 1998-June 19, 2009 | Board | full-time assigned teacher |
| June 19, 2009-June 19, 2010 | Board | reassigned teacher's pool (full salary) |
| June 19, 2010-October 2011 | Board and City Colleges of Chicago | substitute teacher's cadre and part-time professor |
| October 2011-May | City Colleges of Chicago | part-time professor and |

---

[10] There is a suggestion in the record, but no proper evidentiary support for it, that Ortega's employment with the Board continued through mid-March 2012. *See* R. 166-6 at 4 (stating that Ortega's participation in the teaching cadre was terminated on August 29, 2011, but that she continued to be employed by the Board as a day-to-day substitute teacher until March 14, 2012). Neither party has sought to clarify the matter any further, and Ortega's exact ending date does not appear to be relevant to any disputed issue.

| 2013 | | unemployment benefits |
|------|---|------------------------|
| May 2013-present | State of Illinois | human services caseworker, trainee followed by full-salary employee |

## C.    FAILURE TO MITIGATE

"Liability for back pay begins at the time that the [adverse employment action] causes economic injury" and continues through the date judgment is entered in the plaintiff's favor, *Gracia*, 130 F. Supp. 3d at 1255, unless the plaintiff obtains a higher paying job before that date, *see U.S. Equal Emp't Opportunity Comm'n v. Custom Cos., Inc.,* 2007 WL 734395, at *12 (N.D. Ill. Mar. 8, 2007).[11] Because Ortega's current job with the state government pays less than her former job with the Board, Ortega seeks an award of back pay beginning on June 19, 2010, when she last received full salary as part of the reassigned teacher's pool, through the date of judgment.

An employer may avoid the accrual of back pay by showing that the plaintiff failed to mitigate her damages. *See Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1202 (7th Cir. 1989*)* ("[A] discharged employee must mitigate damages by using 'reasonable diligence in finding other suitable employment.'") (quoting *Ford Motor Co.*, 458 U.S. at 231 (emphasis supplied by court omitted)); *see also Doe v. Oberweis Dairy*, 456 F.3d 704, 714 (7th Cir. 2006) (quoting 42 U.S.C. § 2000e–5(g)(1) ("interim earnings *or amounts earnable with reasonable diligence* by the

---

[11] *See also Nord v. U. S. Steel Corp.*, 758 F.2d 1462, 1472-73 (11th Cir. 1985) (back pay award should extend to date of judgment, rather than to earlier date on which court announced findings of fact following bench trial); *Chapin v. Fort-Rohr Motors, Inc.*, 2009 WL 89658, at *1 (N.D. Ind. Jan. 13, 2009) ("The back pay period for victims of job discrimination typically begins on the date the economic loss starts and ends on the date of entry of judgment.").

person or persons discriminated against shall operate to reduce the back pay otherwise allowable") (emphasis added)). The burden of proving lack of mitigation is on the employer. *Ilona of Hungary, Inc.*, 108 F.3d at 1581. The Seventh Circuit has "emphasize[d]" that, to prevail on a failure to mitigate defense, the employer must prove "'*both* that the [plaintiff was] not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that [she] might have found comparable employment.'" *U.S. Equal Emp't Opportunity Comm'n v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990) (citations omitted) (emphasis supplied by court).

### 1. DILIGENCE

Ortega kept detailed records to document her job applications in the first three years following termination of her tenured position at Hedges Elementary. *See* R. 139 at 166-67 (Tr. Transcript 230-31). She testified that in the first school year after she was reassigned (2009-2010), she applied for 127 teaching positions. *Id.* at 166 (Tr. Transcript 230). The next school year (2010-2011), she applied for about 326 teaching positions. *Id.* In the third school year following her reassignment (2011-2012), she applied for 487 teaching positions. *Id.* Ortega testified that after June 2012 she "decided not to continue investing [her] time and energy [in applying for teaching jobs with the Board]" because "it became apparent to [her] that [she] was not going to obtain [such] a job." *Id.*

The Board argues it has met its burden of proof on its failure to mitigate defense after June 2012[12] by pointing to Ortega's trial testimony that she stopped investing her time and energy in applying for teaching jobs with the Board after June 19, 2012.[13] But in cases in which a court found a lack of mitigation, the plaintiff typically remained unemployed after his or her termination and the

---

[12] Although the Board originally attempted to argue Ortega's job search was less than diligent even before June 2012, it later stipulated that Ortega took adequate steps to mitigate her damages prior to that date. *See* R. 184 at 61.

[13] Contrary to the Board's argument that Ortega stopped applying to jobs with the Board entirely after June 19, 2012, Ortega testified at the post-trial equitable relief hearing that she applied to approximately 50 permanent teaching jobs (as opposed to summer teaching positions) with the Board after that date. *See* R. 184 at 69-71. The Board asks the Court to disregard this testimony on the ground that it is inconsistent with Ortega's trial testimony. But read in context, Ortega's trial testimony was merely about her shift in focus due to her frustration from not being able to get another teaching job, and her desperation regarding the need to be employed. The Board has not cited to any part of Ortega's trial testimony where Ortega specifically was asked to clarify whether "not investing her time and energy" meant she in fact applied to *no* jobs with the Board after June 2012. As far as the Court can tell, the first time that question was asked was at the equitable relief hearing where Ortega responded by estimating she had made approximately 50 post-June 2012 applications for teaching jobs with the Board. She testified that she estimated the number because the Board's job application system changed after June 2012 to make it no longer possible to track the teaching positions for which she had applied. *See* R. 184 at 62-69. Ortega testified that at trial she did not volunteer (since she was not asked) information about post-June 2012 job applications with the Board because, without the records, she had only her testimony to prove them. *Id.* at 176. And because counsel's questioning at trial did not specifically raise the mitigation issue regarding Ortega's post-June 2012 job search efforts, Ortega would not have necessarily been aware of the need to be more precise to rebut the mitigation argument the Board now makes. The Court finds Ortega's explanation for any perceived inconsistencies between her trial testimony and her equitable relief hearing testimony concerning the number of post-June 2012 job applications she made with the Board to be credible. Nevertheless, for purposes of this discussion, the Court will assume based on Ortega's trial testimony that she did not apply to any permanent teaching jobs with the Board after June 19, 2012.

evidence showed he or she had stopped looking for work altogether.[14] Here, Ortega never stopped looking for work and in fact did mitigate her damages when she found and accepted another job. The Board's complaint about Ortega's job search efforts appears to be that she accepted a lower paying job with the state government rather than continued looking for another teaching position with the Board. This strikes the Court as hypercritical. *See Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 779 (N.D. Ill. 2015) (stating that the duty to mitigate should "'not be invoked as grounds for a hypercritical examination of a plaintiff's conduct,'" quoting *Amalgamated Bank of Chic. v. Kalmus & Assocs., Inc.*, 741 N.E.2d 1078, 1086 (Ill. App. 1st Dist. 2000)). Not only that, but most courts have held the opposite of what the Board is arguing; that is, they have held that a plaintiff may "reach[ ] the point where a reduction in expectations is required." *Coleman v. Lane*, 949 F. Supp. 604, 613 (N.D. Ill. 1996); *see Ford Motor Co.,* 458 U.S. at 231 n. 16 ("lower courts have indicated . . . that after an extended period of time searching for [comparable] work without success, a claimant must consider taking a lower-paying position").[15] And

---

[14] *See, e.g., Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1428 (7th Cir. 1986) (where the plaintiff made sixteen job applications in the five years after his discharge, court states: "You cannot just leave the labor force after being wrongfully discharged, in the hope of someday being made whole by a judgment at law. That is an approximate description of what Hunter did."); *Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 825 (N.D. Ill. 2015) (where the plaintiff "essentially conceded that he stopped seriously looking for work after 2012" upon testifying that he only looked "for jobs online and touched base with friends and his sister about potential employment after 2013" but admitted he submitted no job applications in that time period), *aff'd,* 865 F.3d 861 (7th Cir. 2017).

[15] *But compare Graefenhain*, 870 F.2d at 1202 ("A plaintiff's duty to mitigate damages does not require him to 'go into another line of work, accept a demotion, or take a demeaning position.'" (quoting *Ford Motor Co.*, 458 U.S. at 231)).

the Seventh Circuit has said specifically that "the maximum period of unsuccessful search that [the plaintiff] can be allowed, consistently with the record and the case law, is three years," because, "[a]t some point people must put their legal troubles behind them and get on with their lives." *Hunter,* 797 F.2d at 1428.

That is exactly what Ortega did here. She testified that she submitted *hundreds* of job applications each year, and she never testified that she stopped aggressively looking for a job. Nor did she ever admit that she made no applications whatsoever after a certain point. In testimony not tied to any definite time period, she stated that she "applied for at least a thousand jobs," which included "not just . . . high-income [jobs]," like her old teaching position, but non-teaching jobs as well, including "everything that [she] thought [she] might be eligible for." R. 139 at 167 (Tr. Transcript 231). Nevertheless, after three years of searching for a comparable teaching job, she decided to focus her search on *any* employment for which she was qualified.

The Board cites *Williams v. Imperial Eastman Acquisition Corp.,* 994 F. Supp. 926 (N.D. Ill. 1998), for the proposition that, when Ortega accepted the lower paying job with the state government, she made a willful choice to be under-employed. But *Williams* "does not teach that starting an alternative career in lieu of continuing to seek comparable employment necessarily constitutes a failure to mitigate damages." *Snow v. HealthSouth Corp.*, 2001 WL 395124, at *27 (S.D. Ind. Mar. 21, 2001). Rather, the plaintiff in *Williams* sought permanent work in a different field after making only "two inquiries [for comparable work]." 994 F. Supp.

at 932. The *Williams* court viewed this minimal effort as evidence that the plaintiff's "decision to give up on the search and return to his hometown to run the family cattle farm entailed a personal choice to start an alternative career, rather than a serious attempt to mitigate damages." *Snow,* 2001 WL 395124, at *27. Significantly, the *Williams* court specifically noted that the plaintiff "*could have* decided to work permanently on the cattle farm *if* after a diligent search, he could not find comparable work." *Williams,* 994 F. Supp. at 932 (emphasis added). Here, Ortega submitted not two, like in *Williams*, but over nine hundred applications seeking comparable employment with the Board.

The Supreme Court has recognized that "[t]he extended time it frequently takes to obtain satisfaction in the courts may force a discrimination clamant to suffer through years of underemployment or unemployment before being awarded the job claimant deserves. . . . The claimant cannot afford to stand aside while the wheels of justice grind slowly toward the ultimate resolution of the lawsuit. The claimant needs work that will feed a family and restore self-respect. A job is needed—now." *Ford Motor Co.,* 458 U.S. at 221. The Board argues *Ford Motor Co.* is inapposite because it involved an employer charged with discrimination in hiring who attempted to toll the accrual of back pay liability by making a pretrial offer to hire the plaintiff for the job that was previously denied to her. *Id.* at 220. But the Board does not explain why that factual distinction makes any difference here. As the Board itself recognizes (*see* R. 179 at 5), the Supreme Court made the statement about needing a job "now" in the context of interpreting and applying the mitigation

rule. The only difference is that, in *Ford Motor Co.,* the employer argued that back pay did not accrue after it offered the plaintiff a job, whereas here the Board argues that back pay does not accrue after Ortega stopped applying for teaching positions with the Board. The observation about needing a job "now" is just as meaningful to the situation Ortega faced as it was to the situation on which the Supreme Court was commenting in *Ford*. The Court finds that Ortega's three-year effort to find a comparable teaching position with the Board was diligent, and that, after that effort failed to produce any results, Ortega appropriately refocused her job search on any teaching or non-teaching position for which she was qualified.[16]

Implicit in the holdings of the cases approving of a plaintiff lowering her job expectations after a lengthy search for comparable work is the conclusion that, once a lower paying job is accepted, the plaintiff may recover back pay damages without being required to make further mitigation efforts. As one court stated, "a plaintiff must continue his efforts at mitigating his post-verdict but pre-reinstatement

---

[16] *See, e.g., Smith v. Am. Serv. Co. of Atlanta*, 796 F.2d 1430, 1432 (11th Cir. 1986) (the plaintiff's decision to attend school full-time "was entirely reasonable under the circumstances and not a failure to mitigate damages" in light of her efforts to secure employment prior to beginning school and the fact that she worked part-time while she attended school); *Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1275 (4th Cir. 1985) (a plaintiff who unsuccessfully searched for substantially equivalent employment for one year was justified in accepting lesser employment and going to school full-time, even though he no longer sought employment substantially equivalent to the job he lost due to discrimination); *Nord,* 758 F.2d at 1471 (the plaintiff acted reasonably in turning her attention to setting up a business with her husband following a period of time during which she actively searched for employment); *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 489 (4th Cir. 1982) (although the plaintiff "earned substantially less in his new occupation than he had previously," the defendant had "not shown that his decision to turn to real estate, after being illegally fired from his job in the trucking industry, was not bona fide").

losses. Where, however, the plaintiff is genuinely unable to find work or is forced to 'lower his sights' and accept an inferior position, the defendant *will be responsible* for the difference (however great) between what the employee would have been earning and what he actually earned during the period prior to his reinstatement." *Coleman*, 949 F. Supp. at 610 (emphasis added). In any event, Ortega testified that she has never stopped and continues through the present looking for better paying jobs than the job she currently has with the state government. R. 184 at 72-73. The Board's argument that "there is no evidence" that Ortega has been diligently searching for a comparable job, R. 185 at 2, is an attempt to shift the burden of proof to Ortega. The question is not whether Ortega has produced evidence she was diligent but whether the Board has produced evidence she was not.[17] And the fact that Ortega has not been successful in finding comparable work fails to demonstrate that she has been less than diligent.[18] Ortega testified she made a thorough job search and there is no evidence that her thoroughness ended either in June 2012 *or* after she became employed in her new job. Therefore, the Court holds that the

---

[17] *See Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 392-93 (7th Cir. 1975) (upholding the district court's finding that the defendant failed to meet its burden of proof on mitigation issue where, even though there was no evidence in the record affirmatively showing what the plaintiff's efforts were to secure other employment, neither was there any evidence showing that she did *not* do what a reasonable person would do).

[18] *See Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992) ("[T]he plaintiff's burden to mitigate damages does not require success, but only an honest, good faith effort."); *Gedmin v. N. Am. Safety Prods., Inc.*, 2010 WL 4539447, at *3 (N.D. Ill. Nov. 3, 2010) (same) (citing *N.L.R.B. v. Midwestern Personnel Serv. Inc.*, 508 F.3d 418, 423 (7th Cir. 2007), and *Ilona of Hungary, Inc.*, 108 F.3d at 1581-82)).

Board has not shown that Ortega's job search since June 2012 through the date of judgment has been less than diligent.

### 2. LIKELIHOOD THAT ORTEGA MIGHT HAVE FOUND COMPARABLE EMPLOYMENT

Even if the Court were to conclude that Ortega's efforts to mitigate her damages were less than diligent, the Board still has not met its burden of proof on the second issue of whether it was reasonably likely that Ortega would have obtained another teaching job had she continued looking after June 2012. *See, e.g., Gracia,* 130 F. Supp. 3d at 1257 (discussing types of evidence that might satisfy a defendant's burden of proof on the issue); *Coffey*, 145 F. Supp. 3d at 779 (same).[19] Ortega has never denied that teaching jobs with the Board were *available* in the relevant time period. Her argument instead is that it was highly unlikely she would have been able to obtain one of those jobs. The Board argues to the contrary, relying primarily on Ortega's own testimony to prove she could have gotten a teaching job had she kept looking. Ortega testified that, as a result of her more than nine hundred teaching job applications, she received three or four interviews and was

_____

[19] Recently, an employer challenged a district court's holding that the employer was required to prove a reasonable likelihood that the plaintiff could have found a job had her search continued *even though* the employer successfully had demonstrated that the plaintiff never even looked for one. But the Seventh Circuit rejected that challenge. *See Stragapede,* 865 F.3d at 868-69. As the district court in that case explained, the independent requirement of having to prove a reasonable likelihood that the plaintiff could have found a job "makes sense" because "an employee might stop looking for work if none is available, and under that circumstance, the plaintiff's decision to stop looking would itself be reasonable." *Stragapede,* 125 F. Supp. 3d at 826*; see also Gracia,* 130 F. Supp. 3d at 1257 ("it is appropriate" to require the employer to prove the likelihood of finding a comparable job "because the only reason why this question needs an answer is that the *employer* has engaged in illegal discrimination") (emphasis in original).

offered and accepted a job on two occasions. R. 139 at 168 (Tr. Transcript 232). But Ortega further testified that the two offers of employment were retracted before employment was to have commenced. R. 144 at 4. The Court sustained the Board's objection at trial when Ortega attempted to testify to her belief as to why the two job offers were rescinded.[20] In doing so, the Court acknowledged that the excluded testimony might "reflect a reluctance by . . . a principal to . . . hire a teacher who is on that list for one reason or another." R. 139 at 255 (Tr. Transcript 319). In other words, Ortega's testimony about why the job offers were rescinded was relevant to the mitigation issue of whether it was likely Ortega could have obtained a comparable teaching position. But since the mitigation issue had not been raised during trial, the testimony was not allowed at the time. After trial, Ortega submitted a declaration in which she tried to explain the "revoked"[21] job offers:

> On the rare occasion that CPS principals interviewed me in person or on the phone, while I was a reassigned teacher, they dwelled on how I became a reassigned teacher. I was offered a job twice and both job offers got retracted. Even when I had stated that it was under

---

[20] The original ground for sustaining the objection was that Ortega's belief regarding why the job offers were rescinded was speculative and/or based on hearsay. *See* R. 139 at 168-70, 172 (Tr. Transcript 232-34, 236). Later, Ortega made an offer of proof and the Court disallowed the same testimony on the ground that it was not relevant to the merits issue of whether Ortega was terminated by the Hedges principle for discriminatory reasons. *Id.* at 255 (Tr. Transcript 319).

[21] Ortega's testimony at the equitable relief hearing suggested the job offers were never actually extended, as opposed to extended and then revoked. Ortega testified one of the principals said he was waiting on funding but never contacted her again, and the other principal later explained he could not hire her because she lacked a state endorsement that Ortega claims she originally was told was not needed for the position in question. R. 184 at 66-68.

> litigation and was not allowed to talk about the subject, the administrators pressed on.

R. 166 at 8 (¶ 12). While Ortega's post-trial testimony regarding the reasons the two potential job offers never came to fruition arguably is speculative, just as speculative is the conclusion the Board asks the Court to draw from Ortega's experience with the two potential jobs—that it was reasonably likely she would have gotten another teaching position had she kept looking.

The Board also cites to the fact that another tenured teacher testified at trial that she got a teaching position at Hedges Elementary shortly after being placed in the reassigned teacher's pool. But the teacher's testimony does not cover the circumstances under which she obtained her job at Hedges, which, in any event was in the fall of 2010, while Ortega was still looking for comparable teaching positons with the Board. Without information about whether her situation was similar to Ortega's, the Court is unable to draw a non-speculative inference that the ability of the teacher in question to get a job in the fall of 2010 has any bearing on whether Ortega would have been able to do so after June 2012.

Finally, the Board introduced additional evidence at the equitable relief hearing through the testimony of Kathryn Gray, the current manager of the reassigned teacher's pool. The Board argues that "Ms. Gray testified that 58% of the teachers in the reassigned teacher's pool found full-time teaching positions at the Board despite the fact that they were typically limited to five months in the pool." R. 179 at 6. Ms. Gray testified that she was not the manager of the pool during the relevant time period, R. 184 at 214, and it is by no means clear that current

statistics have any meaning for the earlier time period when Ortega was a member of the pool. Ortega testified that "[w]hen [she] was a reassigned teacher [in the] 2009 through 2010 academic year, it was a well known fact that reassigned teachers are blacklisted and most are not rehired as full-time tenured teachers." R. 161 at 5 (¶ 7).[22]

While Ortega's testimony regarding the chances of a reassigned teacher finding a permanent position may be speculative, it would appear that Gray's testimony, though couched in statistics, is just as speculative. As far as the Court can tell, Gray's 58% estimate is not grounded in any objective data. And Gray could not provide a breakdown in terms of how many teachers who got hired from the reassigned teacher's pool were, like Ortega, over the age of 40 and tenured more than ten years, characteristics which Ortega argues would make her chances of finding a permanent position lower than average. *See* R. 184 at 230. Moreover, even if Gray's testimony regarding the percentage of teachers who find a job during their five months in the teacher's pool is not speculative, it is not relevant to Ortega's chances of getting a job after she spent twelve months in the pool. It is just as likely that the chances of finding another teaching position would decline, not increase,

---

[22] It appears the reassigned teacher's pool may have undergone changes after Ortega participated in it, as Gray testified that teachers spend five months in the pool whereas during trial the evidence was that teachers, including Ortega, were placed in the pool for a full year. In addition, even the Board's attorney seemed to acknowledge a difference between the stigma of being in the reassigned teacher's pool during the mitigation time period when Ortega was looking for a job and currently. *See* R. 184 at 189 (asking Ortega whether that stigma had been "reduced" as a result of there now being "thousands of teachers" in the pool looking for jobs because of budget cuts made by the Board in recent years).

either the longer a teacher remained in the pool or afterwards when she no longer is part of the pool (as was the case for Ortega in the post-June 2012 time period when the Board argues she should have continued to look for a teaching job).

In sum, the Court finds that neither Gray's testimony nor any other evidence cited by the Board satisfies the Board's burden of proof on the issue of whether Ortega would have found another teaching position had she continued looking past June 2012. *See Pierce v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 F.3d 562, 575 (7th Cir. 1995) ("Pierce actively pursued comparable employment but had been unable to find anything other than minimum wage (or lower) jobs during the three and one-half years since his discharge. We cannot conclude that the court acted unreasonably in assuming that Pierce would not find a similar job in the future.").[23]

## D. TRIAL STIPULATION

### 1. BACKGROUND

The Board's second argument for limiting Ortega's back pay award requires some background information regarding how the trial stipulation came about. Prior to trial, the parties agreed to an advisory jury verdict on the back pay issue. *See* Seventh Circuit Pattern Civil Jury Instruction 3.11, Committee Comment a ("The court may empanel the jury as an advisory jury on the [back pay] issue; or the

---

[23] The Board miscites *Mattenson v. Baxter Healthcare Corp.,* 438 F.3d 763, 771 (7th Cir. 2006), for the proposition that the "employee is responsible for 'present[ing] persuasive evidence of inability to find a substitute job.'" The *Mattenson* court made the quoted comment in the context of the plaintiff's burden of proof to establish entitlement to front pay, not in the context of the defendant's burden of proof regarding mitigation efforts relevant to the back pay determination. It is the Board's burden to present persuasive evidence of the likelihood Ortega would have found a comparable job.

parties may, with the court's consent, agree that the jury will decide the issue."). During trial, however, it became apparent that neither side was fully prepared to present evidence to the jury on the back pay issue.[24] The Board's counsel requested an accommodation in the trial schedule to allow her time to prepare on some of the back pay issues. The Court said it would consider the matter during a break in proceedings, but when the proceedings reconvened, the parties informed the Court they had reached an agreement for a stipulated back pay amount minus the pension portion of that award, the latter being expressly reserved for post-trial proceedings. R. 141 at 71-72 (Tr. Transcript 639-40).

Upon learning of this agreement, the Court pointed out that if the parties were intending to stipulate to the back pay amount, there no longer was any need for an advisory jury verdict on that issue. R. 141 at 73 (Tr. Transcript 641). But defense counsel pressed for the issue to be included in the jury instructions, with the stipulated back pay amount being told to the jury, so the jury would be aware

---

[24] Initially, Ortega's counsel was unprepared to present evidence concerning Ortega's lost pension benefits. The Court directed the parties to try to reach agreement outside of the jury on the pension amounts because those numbers should have been independently ascertainable and not subject to reasonable dispute. *See, e.g.,* R. 140 at 238 (Tr. Transcript 566) ("If it's stipulated to, it's a pretty easy damage analysis for a jury or for me . . . [s]o I encourage you for maybe the fifth time today to try and reach an agreement on this."); *see also* R. 139 at 136, 263 (Tr. Transcript 200, 327). Later, defense counsel admitted she was unprepared to cross-examine Ortega regarding either the amount of income Ortega had earned from her job with the State of Illinois or what Ortega's salary would have been had she remained employed by the Board. *See* R. 139 at 137, 140 (Tr. Transcript 201, 204). Defense counsel stated she was unprepared because she had understood that lost wages would be decided by the Court. But, as the Court reminded counsel, the parties had agreed to have the jury render an advisory back pay verdict. *Id.* at 137 (Tr. Transcript 201).

Ortega would be receiving at least that amount if it needed to address the question of a separate compensatory damages award. *See id.* at 74 (Tr. Transcript 642). Ortega's counsel did not object to this strategy, but she specifically stated she had not agreed to a final number on the back pay amount. Later, Ortega's counsel indicated agreement to the stipulated back pay amount while placing only one caveat on the record, which was that the amount was subject to later revision by the Court based on Ortega's position that the Board was not entitled to an off-set for unemployment compensation received by Ortega. R. 141 at 117 (Tr. Transcript 685).[25]

As a result of the parties' agreement, the Court gave the following jury instruction:

> If you find the plaintiff has proven her claim of discrimination by a preponderance of the evidence, you may award her as damages any lost wages she would have received from the defendant if she had not been displaced from her position at Hedges Elementary School minus the earnings the plaintiff received from other employment during that time that she would not otherwise have received. It is plaintiff's burden to prove that she lost wages and their amount. If she fails to do so for any periods of time for which she seeks damages, then you may not award damages for that plaintiff. . . . The

_____

[25] The stipulated amount apparently took into account the off-set to which the Board claimed it was entitled. As it turns out, Ortega was correct about the unemployment compensation benefits. *See, e.g., Hathaway v. New Dimension Ctr. for Cosmetic Surgery*, 2006 WL 1594060, at *3 (N.D. Ill. June 6, 2006) ("The Seventh Circuit has stated that courts should not provide a 'setoff of pension and unemployment benefits against Title VII and ADEA back pay awards.'") (quoting *Equal Emp't Opportunity Comm'n v. O'Grady*, 857 F.2d 383, 390 (7th Cir. 1988)). Despite the fact that Ortega expressly preserved this issue during trial, the Board still does not acknowledge the need to add back into the stipulated number the amount of unemployment benefits Ortega received.

> parties have agreed . . . that the amount of back pay at
> issue is $215,835. This amount is only relevant if you find
> plaintiff has proven liability. By stipulating, the
> defendant does not admit any liability.

R. 141 at 139-40 (Tr. Transcript 707-08). No instruction was requested by the Board

or given to the jury for the Board's failure to mitigate defense, notwithstanding

that, prior to entering into the stipulation, the Board had anticipated presenting

that issue to the jury as indicated by its pre-trial proposed jury instructions. The

Board now argues that Ortega's back pay award should be limited to no more than

the $215,835 stipulated amount.

## 2.    ANALYSIS

The Seventh Circuit has said that "[s]tipulations regarding the nature of trial

proceedings are crucial to the prompt and efficient disposition of litigation.

Therefore, once made, a stipulation is binding unless relief from the stipulation is

necessary to prevent a 'manifest injustice' or the stipulation was entered into

through inadvertence or based on an erroneous view of the facts or law."

*Graefenhain*, 870 F.2d at 1206. "As with other matters of trial management, the

district court has broad discretion to decide whether to hold a party to its

stipulations," and its "decision will be overturned on appeal only where the court

has clearly and unmistakably abused its discretion." *Id.* (internal quotation marks

and citations omitted).

The Court's review of the record indicates a number of factors relevant to its

exercise of discretion here. *First,* the circumstances surrounding the stipulation

suggest there was no meeting of the minds regarding what the stipulated amount

was meant to represent. While both parties argue what they "understood" the stipulation to cover,[26] the Court has no way of knowing which of those "understandings" is the collective one when the agreement was reached by counsel outside the Court's presence.[27] Further, the lack of clarity operates on multiple levels. There is no clarity regarding the components of the back pay calculation the stipulation was intended to cover. For instance, was the stipulation supposed to be a gross back pay calculation (Ortega's loss wages without credit for actual earnings) or a net back pay calculation (net of actual earnings), and was it supposed to take into account the Board's failure to mitigate defense? And, there is no clarity regarding whether the stipulated amount was a final, agreed-to number or just an estimate subject to later revision by the Court based on evidence introduced post-trial.

*Second*, the Board cannot argue it will be prejudiced if the Court does not hold Ortega to the stipulation. Ortega "is not materially changing her positions or arguments in any way, such as if she was now seeking to recover a type of damages that she never requested or was seeking to proceed on entirely new theories." *Hathaway*, 2006 WL 1594060, at *4.

---

[26] *See, e.g.,* R. 164 at 2 (Ortega) (it was understood that the stipulated amount was inaccurate and needed to be adjusted for "step up" increases in salary); R. 155 at 6 (Board) (the "understanding" was that the parties' stipulation "only signified agreement that Ortega lost a certain amount of wages between her layoff and trial" and did not include possible off-set for Ortega's failure to mitigate).

[27] The Court also notes the Board has a different counsel in these post-trial proceedings than it had during the trial, and neither party has submitted an attorney affidavit to support their assertion about what was "understood."

*Third*, it would be unfair to hold Ortega to the stipulated amount when the confusion surrounding the stipulation came about as a result of the Board's desire, for strategic reasons and despite its lack of preparation, to submit the back pay issue to the jury for "advisory" purposes. At the very least, if the stipulation in fact was an accommodation to both parties and Ortega did intend to agree to a final number, there is a strong case to be made that the stipulated amount was intended to reflect net back wages and to take into account the Board's failure to mitigate defense.[28] Yet the Board appears to be taking the opposite position, specifically seeking to off-set the stipulated back pay amount with Ortega's actual earnings in her post-termination years as well as a credit for the time period in which the Board argues Ortega failed to mitigate her damages.[29] Either the stipulated amount should be binding on both parties or it should be binding on neither.

---

[28] The stipulated amount was to have replaced the advisory jury verdict on the back pay amount. And the advisory back pay verdict clearly would have accounted for Ortega's actual earnings and the Board's failure to mitigate defense. *See* R. 154 at 26 (Jury Instruction 26); R. 139 at 136-37 (Tr. Transcript 200-01); R. 119 at 60 (Defendant's Proposed Jury Instruction No. 31 on mitigation defense); R. 127 at 49-54 (Pretrial Jury Instruction Conference). Therefore, presumably the stipulated back pay amount also accounted for Ortega's actual earnings and failure to mitigate defense, unless those items were specifically excluded when the stipulation was presented to the Court, which they were not. If the parties intended to permit a further credit for the Board's mitigation defense outside of the stipulation, then presumably the parties would have submitted the mitigation issue to the jury for an advisory verdict, as they had intended to do prior to entering into the stipulation. Yet the mitigation issue was *not* submitted to the jury. This suggests the Board too understood that its mitigation defense was accounted for in the stipulated back pay amount.

[29] *See* R. 155-1 (taking stipulated amount of $215,835 and then subtracting from that amount $65,961.50 for Ortega's failure to mitigate after June 2012, and $71,891.50 ($33,958 + $37,933.50) for Ortega's actual earnings, to arrive at a total suggested back pay award of $77,982).

*Fourth*, it was explicitly recognized by the parties that several back pay issues, such as pension amounts, recovery for health benefits, and whether the Board was entitled to off-set the amount of the back pay award with unemployment compensation, would be dealt with after trial. Ortega's counsel also explicitly preserved the issue of whether Ortega was entitled to additional amounts in back pay for the period after the jury reached a verdict through the date on which judgment was entered. While it is true that, other than these items, Ortega's counsel did not expressly reserve adjustments to the stipulated back pay amount, the opposite also is true; that is, nowhere in the record does it clearly show that the parties intended by entering into the trial stipulation to *preclude* other matters from being raised post-trial for purposes of the Court's final determination on the back pay issue. Further, the Court repeatedly warned the parties that the jury's verdict regarding back pay was for advisory purposes only, and that the Court would retain final decision-making authority on the issue. *See, e.g.,* R. 127 at 50-54; R 141 at 194. Although the Court's comments were made in the context of discussions regarding pension benefits, it would not have been unreasonable for Ortega's counsel to have taken the Court's statements to mean that additional evidence would be allowed after the jury verdict to enable the Court to reach a final conclusion regarding the entire back pay amount.

For all of the above reasons, the Court concludes that the stipulation is not binding, and the Court will decide the back pay issue independent of the trial

stipulation based on the evidence introduced at trial and at the post-trial equitable relief hearing.

### E.   LOST WAGES

The Court now turns to the net lost wages calculation, which includes two components: (1) the total amount of wages Ortega would have received from the Board if she had not been displaced from her position at Hedges Elementary; and (2) Ortega's actual earnings from other employment during the same time period. *See Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985) ("damages are determined by measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by defendant") (internal quotation marks and citation omitted).

#### 1.   PROJECTED EARNINGS

Ortega retained an actuary to determine the amount of her lost earnings. To calculate what Ortega's salary would have been had she not been terminated, the actuary began with the undisputed fact that, during Ortega's final year of full tenured employment, she received an annual salary of $81,646.07. *See* R. 184 at 166; Pl. Exs. 7, 13. The actuary then relied on the salary schedules attached to the Chicago Teacher's Union Collective Bargaining Agreements ("CBAs") to determine what Ortega's salary would have been for each of the applicable school years for which she was entitled to back pay. The evidence introduced at the equitable relief hearing, however, showed that the actuary's calculations were slightly off for several reasons. One reason was that the actuary assumed Ortega was a Lane V,

Step 13 employee when she was terminated, and that, had she not been terminated, she would have automatically moved up one step each year of her employment. *See* R. 184 at 48-49; Pl. Ex. 13.[30] According to James Via, Benefits Analysis for the Chicago Public Schools, this assumption was incorrect because teachers remain at steps 14 and 15 for four years before advancing to the next step. Via also testified that, at some point, intermediate steps were added to Steps 14 and 15, so that instead of moving directly in the following year from one of those steps to the next higher step, an employee moved from Step 14a to Step 14b, for example. *See* R. 184 at 40, 48-49. In addition, Via testified that, because of the Board's recent financial distress, a step freeze was implemented in June 2015. *See id.* at 56-57 (no advances in steps or lanes since June 30, 2015).

Another way in which the actuary's calculations might have been slightly off were that they may have failed to account for the fact that an employee moves up a step on the anniversary date of his or her employment with the Board rather than at the start of the next school year. Ortega's anniversary date was January 26. R. 184 at 41. Therefore, Ortega would have begun a school year in September at her

---

[30] The terms "lane" and "step" refer to the pay structure for union employees set out in the CBAs. "Lanes" are determined based on educational credentials. R. 184 at 40, 47. Employees may move into a higher lane by adding to their educational credentials, as Ortega appears to have done when she obtained a masters degree and skipped from Lane III to Lane V in October 2006. *See* Def. Ex. Y at page 10. "Steps" are based on years of experience, with each step representing a pay increase within a given lane. R. 184 at 40, 47. The number of steps in each lane varies. Employees generally will move up a step every year. *Id.* at 40, 47-48. An employee who reaches the highest step in a lane will remain at that salary level indefinitely unless and until he or she obtains the credentials needed to move into a higher lane. *Id.* at 48. The highest lane Ortega achieved was Lane V. At all relevant times, the highest possible step within Lane V was Step 16.

previous step and moved up to the next step about mid-way through the school year. The actuary's projected salary figures for each school year relied on the annual salary amounts shown in the CBA for each new step, when, according to the Court's interpretation of Via's testimony, Ortega's actual salary for a given school year would have been a blend of the salary shown on the CBA schedule applicable to that school year for her old, carry-over step (September through January) and the salary for her new, or next step up (February through June).

Ortega argues that, after adjustments are made to her actuary's calculations to reflect what she believed the evidence at the hearing showed regarding step increases, her salary in the years following her termination would have been as follows:

| School year | Salary |
|---|---|
| 2010-2011 | $85,994 |
| 2011-2012 | $90,473 |
| 2012-2013 | $89,836 |
| 2013-2014 | $91,853 |
| 2014-2015 | $93,665 |
| 2015-2016 | $95,538 |

The total lost earnings through August 2016 sought by Ortega is $547,359. R. 178 at 6. While these numbers partially address the mistakes in some of the actuary's assumptions, they still appear to be somewhat inaccurate. Ortega appears to assume she would have moved to a step 15 after spending only one year at step 14 when Via testified there was a four year wait before moving from step 14 to step 15. And

while Ortega's counsel suggested at the hearing that she took into account the mid-year change for when the move up in step occurs, she did not introduce evidence to prove that assertion. Finally, Ortega's newest calculations do not appear to take into account the 2 percent mandatory employee contribution to the pension fund, which her actuary deducted from the annual salary figures.

The Board argues that Ortega's lost earnings had she not been terminated amount to only $524,062. *See* R. 179 at 7. The Board's salary projections are shown on Exhibit Z, which was a document generated by the Board for purposes of the equitable relief hearing and introduced during Via's testimony. Via testified, however, that he was not involved in the preparation of Exhibit Z, and he was never asked whether he could attest to the accuracy of the calculations reflected in it. R. 184 at 52. Although Ortega did not object either to the admission of that document for lack of foundation, or to Via's testimony concerning the information contained in that document for lack of personal knowledge, the Court takes Via's admission of lack of personal knowledge into account in deciding what weight to give that document. The Board's salary calculations on Exhibit Z show only a biweekly pay figure, not an annual pay amount, and do not indicate the lane or step from which that biweekly pay figure is derived. Further, Via testified he did not know what lane or step was being applied. Therefore, it is difficult for the Court to make any kind of assessment as to the degree to which Exhibit Z accurately reflects what Ortega's salary would have been.

"In determining the proper award of back pay, a court must make sure that any award is not speculative and does not put the plaintiff in a better position than she was before her termination." *Hathaway*, 2006 WL 1594060, at *2 (citing *Ilona of Hungary, Inc.*, 108 F.3d at 1580 (quoting *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir. 1988) for the idea that "[t]he court must 'do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred'")). When confronted with "uncertainty which clouds the task" of computing a back pay award, however, the Seventh Circuit has "set down three general rules: (1) unrealistic exactitude is not required; (2) ambiguities in what an employee . . . would have earned but for discrimination should be resolved against the discriminating employer; [and] (3) the district court, far closer to the facts of the case than [the Court of Appeals] can ever be, must be granted wide discretion in resolving ambiguities." *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976).

The Board argues the Court should disregard the calculations of Ortega's actuary because of the "numerous inaccuracies" the Board claims its cross-examination revealed. But the discrepancies resulting from predictions and/or presumptions made by the actuary did not call into question the basic accuracy of his calculations; they only suggested that his calculations were slightly off (the difference between the Board's calculation of loss wages and Ortega's revised calculation is around 4.5 percent). And, as previously noted, exactness is not

required.[31] While the Court finds that Ortega's salary projections are reasonably accurate and supported by the record, it also has the necessary information to make adjustments to her calculations where the evidence supported a slightly different calculation. Based on the evidence, the Court finds the following projected salaries should be applied:

| School Year | Step | | Salary | 2% Pension Contribution | Total Salary |
|---|---|---|---|---|---|
| 2010-2011 | 1st half | 13 | $84,912 x ½ = $42,456 | $849 | $41,607 |
| | 2d half | 14 | $85,994 x ½ = $42,997 | $860 | $42,137 |
| 2011-2012 | 14 | | $89,433 | $1,789 | $87,644 |
| 2012-2013 | 14 | | $88,815 | $1,776 | $87,039 |
| 2013-2014 | 1st half | 14 | $89,611 x ½ = $44,805 | $896 | $43,909 |
| | 2d half | 14b | $90,591 x ½ = $45,296 | $906 | $44,390 |
| 2014-2015 | 1st half | 14c | $92,403 x ½ = $46,202 | $924 | $45,278 |
| | 2d half | 15a | $93,665 x ½ = $46,833 | $937 | $45,896 |

---

[31] *See also Geraty v. Vill. of Antioch*, 2014 WL 1475574, at *2 (N.D. Ill. Apr. 15, 2014) ("measuring back pay always involves some level of speculation, and so back pay calculations need not be precise; exactness is not expected") (internal quotation marks and citation omitted); *Thompson v. Altheimer & Gray*, 2001 WL 1618717, at *2 (N.D. Ill. Dec. 18, 2001) ("Any method is simply a process of conjectures. . . . [E]xact construction of each individual claimant's work history, as if discrimination had not occurred, is not only imprecise but impractical.") (internal quotation marks and citation omitted).

The step freeze went into effect in June 2015, when the 2012-2015 CBA expired. But in the 2015-2016 school year, Ortega would have remained at Step 15a in any event. After expiration of the 2012-2015 CBA, the Board and the Chicago Teachers Union failed to reach agreement on a new CBA, so there are no new salary schedules to apply to the 2015-2016 school year (and later). The actuary testified that he assumed that had there been new salary schedules, they would have provided for at least a two percent salary increase, and Via, the Board's expert witness, agreed that this assumption was reasonable. While Via testified to a step advancement freeze, no evidence was presented that all teacher salaries were frozen and teacher's received no pay increase whatsoever.[32] Therefore, for the 2015-2016 school year, the Court will assume a two percent pay increase in the Lane V, Step 15a salary that Ortega would have been receiving in the second half of the 2014-2015 school year ($93,665 x 2%=$1,873), making the projected earnings for that year $95,538 less the 2 percent pension contribution ($1,911), or $93,627.

### Summary of Projected Earnings

| | |
|---|---|
| 2010-2011 | $83,744 |
| 2011-2012 | $87,644 |
| 2012-2013 | $87,039 |

[32] While counsel for the Board suggested in her cross-examination of the actuary that teacher salaries were in fact frozen, she appeared later to specify that her reference to a salary freeze was really a reference to a freeze in lane or step adjustments. *See* R. 184 at 127. In any event, questions of counsel are not evidence, and since the Board did not submit any evidence of a salary freeze other than Via's testimony concerning the step freeze, only the latter has any evidentiary support in the record.

| | |
|---|---|
| 2013-2014 | $88,299 |
| 2014-2015 | $91,174 |
| 2015-2016 | $93,627 |

### 2. ACTUAL EARNINGS

The actuary obtained Ortega's actual earnings information from her tax returns, and then made adjustments to reflect that the relevant earnings figures are for school years rather than tax returns. *See* Exhibit 13. The Board also uses Ortega's tax returns to determine her actual earnings. *See* R. 179 at 7 (citing to Plaintiff's Exhibit 8). But the Board did not make any adjustments to account for the fact that Ortega's actual earnings, like her lost earnings had she remained in her job with the Board, must be calculated on a school year basis. Therefore, the Court will use the more accurate actual earnings figures calculated by the actuary.

### 3. NET LOST WAGES

Putting together the above information, Ortega's net lost wages for each school year through August 15, 2016 are as follows:

| | PROJECTED EARNINGS | ACTUAL EARNINGS | NET LOST WAGES |
|---|---|---|---|
| 2010-2011 | $83,744 | $29,147 | $54,597 |
| 2011-2012 | $87,644 | $15,828 | $71,816 |
| 2012-2013 | $87,039 | $21,314 | $65,725 |
| 2013-2014 | $88,299 | $40,408 | $47,891 |
| 2014-2015 | $91,174 | $49,873 | $41,301 |
| 2015-2016 | $93,627 | $52,169 | $41,458 |

Ortega's total net lost wages from June 2010 through August 2016 amounts to $322,788.

## F.  PREJUDGMENT INTEREST

Prejudgment interest is presumptively available on a back pay award. *See Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003) ("in most cases prejudgment interest is an element of full compensation"); *Gorenstein Enter., Inc. v. Quality Care-U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay.").

### 1.  THE ISSUE OF DELAY

The Board argues that the Court should deny Ortega an award of prejudgment interest because of her "delays in filing, serving and prosecuting this case." R. 179 at 8-9. Ortega was required to bring her civil action against the Board within 90 days of receiving a right to sue notice from the Equal Employment Opportunity Commission ("EEOC"). 29 C.F.R. § 1601.28(e)(1). There is no contention that Ortega's filing of this lawsuit was untimely under this provision.[33]

---

[33] "The ADA adopts Title VII's procedures in requiring a plaintiff to file a timely charge with the EEOC and to receive, in return, a right-to-sue notice from the EEOC before filing suit against an employer. *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5); *E.E.O.C. v. Harris Chernin, Inc.*, 10 F.3d 1286, 1288 n. 3 (7th Cir. 1993). Plaintiffs have ninety days from receipt of the right-to-sue notice in which to file a complaint. 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000e-5(f)(1)). 'Thus, absent special circumstances which give rise to waiver, estoppel, or equitable tolling of the ninety-day period, failure to file a complaint

Nevertheless, the Board argues that Ortega did not have to wait until the EEOC decided to issue a right to sue notice; instead, Ortega could have prompted the issuance of the notice sooner by exercising its right under 29 C.F.R. § 1601.28(a)(1) "at any time after the expiration of one hundred eighty (180) days from the date of filing of the charge with the Commission" to request the EEOC to issue the notice immediately. Had Ortega done so, the Board argues, she could have received a right to sue notice as early as January 12, 2010 (180 days after filing her July 17, 2009 charge). Instead, she waited two additional years—until August 31, 2011—for the EEOC to issue the notice on its own. She then did not serve the Board with suit until January 17, 2012, when, according to the Board, she could have done so more than four months earlier. Ortega claims that she did not delay in seeking redress for her discrimination claims and in fact that she "went above and beyond."[34]

The Court does not agree that Ortega should be denied prejudgment interest based on the fact that she could have filed this lawsuit and served the Board earlier than she did. The definition of "delay" is "the act of postponing, hindering, or causing something to occur more slowly than normal." https://www.merriam-webster.com/dictionary/delay. The Board does not contend that Ortega filed her

---

within such period bars adjudication of those claims.' *Martini v. A. Finkl & Sons Co.*, 1996 WL 667816 (N.D. Ill. Nov. 15, 1996)." *Freeman v. Travelers Cos., Inc.*, 63 F. Supp. 3d 867, 871 (N.D. Ill. 2014).

[34] *See* R. 184 at 164 ("[She] found every public agency where [she] could file . . . at every level. At the local, at the state, at the federal. [She] contacted even . . . government attorneys [at the U.S. Justice Department] that [she] knew [were not] . . . in a position to interfere, but [she] was just so desperate to get somebody to help [her] out.").

lawsuit or served the Board outside the time periods permitted by the applicable rules. Congress already has set forth what it believes is a reasonable time for filing suit and serving a complaint, and Ortega did those things within those deadlines. By definition, therefore, she did not do anything slower "than normal." To impose some other, shorter timeline would be arbitrary and create unnecessary uncertainty, as well as penalize employment discrimination plaintiffs for exercising procedural rights to which they are entitled under the discrimination statutes and federal rules of civil procedure.[35]

In addition, the Board fails to take into account substantial delay during the administrative process (prior to Ortega's filing of an EEOC complaint) for which Ortega claims the Board was responsible. *See* R. 166 at 2 ("Upon participating in the arbitration process, Board lawyer Edward J. Wong III . . . delayed about six months in submitting the Board's response."). It would not be fair to impose a penalty on Ortega for delay in the EEOC proceeding without taking into account delay caused by the Board in investigating and administratively resolving Ortega's complaints prior to her filing of the EEOC complaint, and the slippery slope of such a comparative analysis were the Court to embark on that path is obvious.

---

[35] The Board cites *Martyne v. Parkside Medical Services,* 2000 WL 748096, at *12 (N.D. Ill. June 8, 2000), in support of its argument to the contrary. But the *Martyne* court did not cite any authority for penalizing the plaintiff for filing a lawsuit within the deadline. Moreover, the reason cited by the *Martyne* court for denying plaintiff prejudgment interest was that he waited four years to receive a "right to sue" letter from the EEOC. Here, the EEOC issued its right to sue notice and Ortega filed suit after only two years, according to the Board.

The Board also claims Ortega should be penalized for the delay caused by her missing certain court deadlines during this litigation, which purportedly prevented the Court from ruling on the Board's dispositive motions and Ortega's demand for equitable relief in a timely manner. R. 179 at 8. The Court again rejects the Board's delay argument. While Ortega missed one or two deadlines following the jury's verdict, she did so by only a week or less. There has been no showing by the Board that those missed deadlines actually caused delay in the timing of any court ruling or the overall progression of the case, and the Court is skeptical that they did.

In addition, as is often the case, both parties have been responsible for some delay. *See Coleman*, 949 F. Supp. at 614 (finding that both sides have "failed to exercise sound judgment and due diligence"). For instance, on at least one occasion following the jury verdict, a four to five week delay was occasioned by a combination of furloughs being imposed on the Board's counsel and the same counsel's pre-planned extended vacation outside the country. *See* R. 172. Ortega also points out several instances in which delay occurred as a result of the strategy taken by the Board in addressing the back pay issue. *See, e.g.,* R. 164 at 2 (arguing that the Board refused to confirm Ortega's salary and step designations in April 2016); R. 164-1 (arguing that the Board refused to discuss issues that could have been resolved by agreement related to the amount of judgment, insisting that Ortega first provide a proposed judgment (*i.e.*, without giving her the information she needed to do the calculations required for her to submit a proposed judgment)).

Ortega's argument regarding difficulties she has had with the Board during these post-trial proceedings brings up another point. Most if not all of the information necessary to determine the back pay amount was within the Board's control. Had Ortega simply presented her best estimates, the Court might have concluded that was sufficient and resolved the back pay issues sooner.[36] But the Court allowed the matter to be delayed in hopes that the parties might be able to reach agreement as to most if not all of the disputed amounts. That has been the Court's experience in other cases, as these disputes are usually just arithmetic and capable of reasonable resolution. Instead, the Board refused to engage informally with Ortega over the outstanding equitable relief issues and repeatedly stood on technical objections to Ortega's efforts to discover the information she needed to present her damages to the Court. After the Court was forced to referee several disputes over the Board's technical objections, the parties finally managed to present evidence on back pay calculations at the equitable relief hearing. Yet even that evidence had a tendency to raise more questions than it answered, as shown previously herein, forcing the Court to take the laboring oar in performing its own calculations. The result was more delay between the equitable relief hearing and the issuance of this opinion. It would be a further waste of judicial resources for the Court to attempt to add up the delay occasioned by each party's litigation mistakes

---

[36] *See Coleman*, 949 F. Supp. at 609 ("Defendant, which presumably has superior access to information concerning the pay and benefits Plaintiff would have earned had he remained employed at CHA, has not rebutted Plaintiff's calculations. The court gives Plaintiff the benefit of the doubt and finds that his request suffices as a threshold showing of damages owed.").

or tactics to determine which side bears a greater responsibility for the time that has passed.

In sum, despite whatever role Ortega may have played in any delay that has occurred in this case before or after trial, the Court finds that delay should not count against her in regard to her entitlement to prejudgment interest according to the law. *See Hunter*, 797 F.2d at 1426-27 ("Since Allis-Chalmers' misconduct in firing Hunter was deliberate, equitable considerations even if admissible to contest prejudgment interest do not weigh heavily in its favor.").

### 2. AMOUNT OF PREJUDGMENT INTEREST

Both parties agree that the proper prejudgment interest rate is 3.25 percent. R. 179 at 8-9; R. 180 at 3 n. 2; R. 184 at 104, 106; *see Arroyo v. Volvo Grp. N. Am., LLC*, 2017 WL 2985649, at *10 (N.D. Ill. July 13, 2017) (awarding prejudgment interest at a rate of 3.25 percent (compounded monthly)); *Gracia*, 130 F. Supp. 3d at 1263 (using 3.25 percent (compounded monthly) because "that was the prime rate for almost the whole prejudgment period in this case, except for a few weeks when it was 3.61 percent"); *Sheils v. GateHouse Media, Inc.*, 2015 WL 6501203, at *10 (N.D. Ill. Oct. 27, 2015) (using the average of the prime rate in effect for the years in question, which was 3.25 percent).[37] The Board does not dispute that prejudgment

---

[37] Ortega might have argued for a higher prime rate as either the average prime rate figure, *see Washington*, 2016 WL 3058377, at *9 & n.10 (using a 3.4172 percent figure, which the court calculated to be the average of the prime rates between March 2008 and November 2015), or at least for a portion of the period encompassing the prejudgment interest award, *see Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1011-12 (N.D. Ill. 2016) (applying 3.25 percent until

interest is to be compounded monthly. R. 163 at 3 n. 3; *see Am. Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 937-38 (7th Cir. 2003) (compounded interest "is the norm in federal litigation" (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)); *Washington* 2016 WL 3058377, at *9 (compounding prejudgment interest monthly until date of judgment); *Sheils,* 2015 WL 6501203, at *10 (same).

Neither party addresses the method for calculating prejudgment interest. The actuary obviously applied some method for his interest calculation but it was not explained either in his report or during his testimony at the hearing. And the Court cannot adopt Ortega's method for calculating prejudgment interest in her post-equitable relief hearing brief, which relies to some extent on the concededly inaccurate figures presented by her actuary, because the Court does not fully understand it.[38] Nevertheless, the record contains sufficient information for the Court to provide a ruling on the issue. Because a plaintiff generally is paid at

---

December 16, 2015, and 3.5 percent thereafter). But because she has not done so, the Court will use the agreed-to 3.25 percent rate.

[38] According to Ortega, she applied a percentage to the total lost wages plus prejudgment interest calculation of her actuary. But the Court cannot determine how Ortega arrived at the $19,153.19 figure on which her percentage calculation is based. At one point she says that figure is the "difference between Plaintiff's [adjusted] and Defendant's calculations, R. 178 at 6, and at another point, she says it is the difference between her actuary's gross amount and that amount "adjusted to reflect the alleged error in step designation." R. 180 at 3. These are two different calculations, and, in any event, neither leads to the $19,153.19 figure. And even apart from the mysterious $19,153.19 figure, the approach of applying a percentage to the actuary's total lost wages plus prejudgment interest calculation is obviously inaccurate because some portion of the prejudgment interest amount to which the percentage is applied is excess interest to which Ortega is not entitled.

regular intervals throughout the year, such as bimonthly or every other week, interest technically should be compounded going forward from each paycheck.[39] Ortega, having failed to present those calculations, however, has waived them. Instead, the Court will assume for purposes of this calculation that Ortega received her annual salary as a lump sum at the end of each school year in which it was earned, and calculate the interest on each annual salary amount from that date going forward, compounded monthly. *See Geraty*, 2014 WL 1475574, at *3. The Court will end its prejudgment interest calculation on November 30, 2017, the date on which it anticipates judgment will be entered in the case. Using an online compound interest calculator, the Court calculates the prejudgment interest as follows:

|  | 2010-2011 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|---|---|
| Principal (Net Lost Wages) | $54,597 | $71,816 | $65,725 | $47,891 | $41,301 | $41,458 |
| Interest Period | June 1, 2011 through November 30, 2017 | June 1, 2012 through November 30, 2017 | June 1, 2013 through November 30, 2017 | June 1, 2014 through November 30, 2017 | June 1, 2015 through November 30, 2017 | June 1, 2016 through November 30, 2017 |
| Accrued Months | 77 | 65 | 53 | 41 | 29 | 17 |
| Rate (compounded monthly) | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% |
| Interest | $12,641 | $13,803 | $10,130 | $5,616 | $3,370 | $1,951 |

[39] *See Shorter v. Hartford Fin. Servs. Grp., Inc.*, 2005 WL 2234507, at *7 (D. Conn. May 31, 2005).

The total amount of prejudgment interest is $47,511.

## H. BACK PAY THROUGH THE DATE OF JUDGMENT

The Board has conceded that, absent the Court ruling in its favor on its failure to mitigate defense, Ortega is entitled to back pay through the date judgment is entered in the case. *See* R. 139 at 261 (Tr. Transcript 325); *see also* R. 127 at 52. The parties have provided calculations of back pay through the August 15, 2016 equitable relief hearing. In *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1369 (7th Cir. 1992) (*McKnight II*), the Seventh Circuit held that it would be an abuse of discretion not to let the plaintiff submit evidence of lost wages post-trial through date of judgment.[40] The Court anticipates that judgment will be entered on or about November 30, 2017. The Court calculates Ortega's gross lost wages for the 2016-2017 school year and the 2017-2018 school with the same methodology used earlier in this opinion, starting with the 2015-2016 salary of $95,538 and adding a 2 percent salary increase for each following year, and then subtracting Ortega's required 2 percent pension contribution:

| Academic Year | Annual Salary | Employee Pension Contribution (2%) | Net Salary [annual salary less pension contribution] |
|---|---|---|---|
| August 2016-June 2017 | $97,449 [$95,538 + 2%] | $1,949 | $95,500 |
| August 2017-June 2018 | $99,398 [$97,449 + 2%] | $1,988 | $97,410 |

---

[40] *See also Pace v. Pottawattomie Country Club Inc.*, 2009 WL 4843403, at *3-4 (N.D. Ind. Dec. 11, 2009) ("any lag time between the jury's verdict and the district court's ultimate judgment ordinarily should be remedied by the court, in the form of a pro rata increase of the back pay award") (citing *Bank v. Travelers Cos.*, 180 F.3d 358, 364 (2d Cir. 1999)); *Shorter*, 2005 WL 2234507, at *4-5 (same).

Thus, Ortega's projected earnings are $95,500 for the 2016-2017 school year, and $38,964 ($97,410 x 4/10[41]) for part of the 2017-2018 school year (August 2017 through November 2017), for a total of $134,464. The Court will once again assume a 2 percent pay increase, which results in $53,212 in actual earnings in 2016-2017 ($52,169 + $1,043), and $54,276 for the 2017-2018 year ($53,212 + $1,064), of which the Court considers only the first four months through November 2017, or $21,710 ($54,276 x 4/10). Ortega's total actual earnings add up to $74,922 ($53,212 + $21,710). Offsetting her projected wages from August 2016 through November 30, 2017 with the Court's estimate of her actual earnings results in an additional back pay award through the date of judgment of $59,542, plus $856 in additional prejudgment interest, for a total back pay additur of $60,398.[42]

## FRONT PAY

In addition to back pay, Ortega seeks an award of front pay. "[F]ront pay is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998). "Generally, front pay is awarded as a

---

[41] Ortega's annual salary as a teacher is spread out over a ten rather than twelve month period (August through June).

[42] The Court calculated prejudgment interest on net lost wages for 2016-2017 of $42,288 ($95,500 less $53,212) beginning June 2017 for a 6 month period ($692). It calculated prejudgment interest on net lost wages for 2017-2018 (through November 30, 2017) of $17,254 ($38,964 less $21,710) beginning on August 2017 for a 4 month period, dividing the four months in monthly installments and applying prejudgment interest on the compounded monthly amount through November 30, 2017 ($164).

substitute remedy when reinstatement is inappropriate, such as when 'there [is] no position available or the employer-employee relationship [is] pervaded by hostility.'" *Id.* (quoting *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986)); *see McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990) ("*McNight I*") (if "reinstatement is withheld because of friction that would ensue independently of any hostility or retaliation by the employer, a remedy limited to back pay will not make the plaintiff whole"; in such cases, front pay fills the "remedial gap"). "As an equitable remedy, the district court has discretion to decide whether to award front pay." *Graefenhain*, 870 F.2d at 1201.

The Board argues the Court should deny Ortega's request for front pay because the Board has offered to reinstate her. But Ortega has rejected the Board's offer. The question, therefore, is whether the Board's rejected offer of reinstatement cuts off Ortega's right to recover front pay. The same issue was addressed by the Supreme Court in *Ford Motor Co.*—only in the context of a claim for back pay. The defendant in *Ford Motor* sought to cut off the accrual of damages while litigation over the plaintiffs' discrimination in hiring claim was pending by offering the plaintiffs the job that previously was denied to them. The Supreme Court noted that a discrimination plaintiff has a duty to mitigate his damages by using "reasonable diligence in finding other suitable employment." 458 U.S. at 231. A plaintiff's refusal of a job "substantially equivalent to the one he was denied" constitutes a failure to mitigate. *Id.* Therefore, the Supreme Court held, an employment discrimination plaintiff must accept "an unconditional offer of the job originally

sought" or forfeit his right to back pay in the period following the defendant's offer. *Id.* at 231-32.

The Board is correct (R. 179 at 2-3 n.1 ) that this case does not raise any issue related to the "unconditional" part of the offer of employment discussed in *Ford Motor*. *See* 458 U.S. at 227 ("if an employer *unconditionally* offers a claimant the job for which he previously applied, the claimant's rejection of that offer should toll the continuing accrual of backpay liability") (emphasis added). The "unconditional" aspect of the defendant's job offer in *Ford* was that the defendant made the offer without requiring the plaintiff as a condition of its acceptance "to abandon or compromise her Title VII claim" against the defendant. *Id.* at 222. Thus, the requirement that the offer be "unconditional" (which was not in dispute in *Ford Motor*) only comes into play if the offer is made prior to resolution of the defendant's liability for discrimination, when abandonment or compromise is still possible. But the Board is wrong to say that, because this case does not raise any issue related to the "unconditionality" of the Board's offer (the Board, already having been found liable for discrimination), *Ford Motor* is inapposite to Ortega's request for front pay. The rule enunciated by *Ford Motor* is as relevant to a plaintiff's duty to mitigate after trial as it is to a plaintiff's duty before trial, as shown by the fact that the Seventh Circuit applied *Ford Motor* in *Graefenhain* to decide whether a defendant's offer of reinstatement was adequate to cut off the plaintiff's right in that case to recover front pay. In the front pay situation, the defendant does not need to show that the offer of reinstatement is "unconditional," but it does need to show that the

offer is for a job that is "substantially equivalent," *Ford Motor*, 458 U.S. at 231. As the *Graefenhain* court explained:

> The accrual of damages for a discriminatory discharge is not terminated merely because the employee refuses an offer of reinstatement; instead, it is only "an *unreasonable* refusal . . . [which] will preclude recovery of front pay." Since the employer bears the burden of proof as to the adequacy of an offer of reinstatement, the employer must initially make an offer which is sufficiently specific to support a finding that the tendered employment is comparable to the employee's prior job. Only after receiving an appropriately detailed offer is the discharged employee required either to accept the offer or to provide specific reasons why it is inadequate.

870 F.2d at 1203 (citations omitted) (emphasis added by court).

Thus, under the two-step approach outlined in *Graefenhain,* the initial question is whether the Board's offer of reinstatement is for a job that is comparable to Ortega's prior job. The Board bears the burden of proof on that issue. *Id.* If the Board's reinstatement offer is not for a comparable job, the Court need not evaluate Ortega's reasons for rejecting it. If the offer is for a comparable job, the Court then goes on to examine Ortega's reasons for refusing the offer. Only if the offer is inadequate because it is not for a comparable job, or, the offer is adequate but Ortega's reasons for rejecting it are valid, does the Court move on to the task of calculating an award of front pay in lieu of reinstatement.

## A.    THE BOARD'S REINSTATEMENT OFFER

The Board did not offer to reinstate Ortega to her former teaching position at Hedges Elementary. Instead, the Board offered to return Ortega to the reassigned teacher's pool for four years or until such time as she received an offer for a

permanent teaching job. During her period of employment as a reassigned teacher, Ortega would receive the same salary and benefits to which she would have been entitled as a permanent assigned teacher at Hedges. And, while teachers in the reassigned teacher's pool typically switch schools every few weeks to allow them to maximize their contacts within the Board to assist in the search for a permanent assignment, the Board offered to let Ortega "opt out of the Pool rotation." But the Board made this right to opt out dependent on "the discretion of the Board unit which operates the Pool." *Id.* Therefore, it is not clear whether any opt-out right actually was being accorded. In any event, assuming Ortega opted out of the rotation and the Board unit that operated the pool did not object, Ortega could choose from a list of schools that the Board designated as "high-needs schools for substitute teachers," where she would be allowed to report "for more than 2 weeks." R. 144 at 5-6.

Whether an offer of reinstatement is adequate to trigger the *Ford Motor* rule requiring the plaintiff to accept it or forego recovery of further damages "is largely a fact question, which requires weighing the employee's prior experience and job skills against the terms and conditions of the offer. Since predominantly factual, the trial court's determination as to the adequacy of a reinstatement offer will be upset on appeal only if clearly erroneous." *Graefenhain*, 870 F.2d at 1203. The adequacy of the offer is measured broadly by the standard applicable to an employment discrimination plaintiff's duty to mitigate. *Id.* at 1202. A plaintiff's duty to mitigate

is discharged "by using 'reasonable diligence in finding other *suitable employment.*'"

*Id.* (quoting *Ford Motor,* 458 U.S. at 231) (emphasis added by court).

> Under the mitigation doctrine, the employee "need not go into another line of work, accept a demotion, or take a demeaning position." [*Ford Motor*, 458 U.S. at 231.] An employee "need not 'seek employment which is not consonant with his particular skills, background, and experience' or 'which involves conditions that are substantially more onerous than his previous position." [*Id.* at 231 n.16].

*Graefenhain*, 870 F.2d at 1202. In short, "[a]n offer of reinstatement tolls the accrual of damages *only if* it 'afford[s] the claimant *virtually identical* promotional opportunities, compensation, job responsibilities, working conditions, and status.'"

*Id.* at 1203 (emphasis added) (citation omitted).

As an initial matter, the Board's equivocation on whether it has offered to reinstate Ortega at all is enough to give the Court serious pause over whether it needs to even address front pay versus reinstatement, notwithstanding that the Board argues at length on the issue. The Board has stated that Ortega's "contention that the Board has 'offer[ed]' to reinstate [her] as a reassigned teacher . . . for four years," is incorrect and that, in fact, "[t]he Board has repeatedly denied four years is an inappropriate period for equitable relief in this case and has not 'offered' to reinstate Plaintiff. Rather, pursuant to the Court's request, the Board has described for Plaintiff what reinstatement will entail *if the Court orders it.*" R. 162 at 4 (emphasis added).

If Ortega does not request reinstatement (which she does not), and the Board has not offered reinstatement (which the Board contends it has not), then the Court

is left wondering why the parties are even talking about anything other than the question of the sufficiency of the evidence on Ortega's front pay request. The Board's "offer" apparently is to comply with a court order of reinstatement, but the Board says it can comply only with a court order of reinstatement for a period of four years. And a four-year reinstatement is not a comparable job with "virtually identical" characteristics to Ortega's previous job at Hedges. The Board contends four years in the teacher's pool is an appropriate offer because Ortega requested front pay for only a four year period. But reinstatement is supposed to as nearly as possible restore the status quo; that is, return the plaintiff to either the same job or one comparable to the job lost by the discrimination. Ortega's previous tenured teaching job with the Board did not have a four year limit on it. Just as reinstatement would not guarantee Ortega employment for a four-year period (she was an at-will employee), reinstatement should not limit Ortega to a defined term when her previous job did not have a term limit.[43] Therefore, the time limit aspect of the Board's offer "of compliance with a court order of reinstatement" renders the job to which the Board has said it should be ordered to return Ortega not substantially equivalent to her previous job with the Board. *See Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 757 (7th Cir. 1983) (reinstatement offer

---

[43] The reason why front pay awards are limited in duration is that the plaintiff is expected to have found a permanent replacement job by that date, thereby mitigated his damages down to zero. *Williams*, 137 F.3d at 954. The Board's reinstatement offer is supposed to function as that permanent replacement job, but does not do so if it is limited to four years.

insufficient where, among other things, it failed to provide employee with written assurance of job security until age 60).

Even apart from the time limit, the Court rejects the Board's contention that its offer of reinstatement[44] is adequate because it guarantees Ortega a comparable salary and identical benefits as her terminated job at Hedges. Instead, the Court agrees with Ortega that the Board's offer of reinstatement is insufficient under *Ford Motor* and *Graefenhain* to cut off Ortega's right to receive front pay because it does not provide for substantially the same job responsibilities, working conditions, promotional opportunities, or status as Ortega's previous job.

*Job Responsibilities and Working Conditions*. Ortega argues that a reassigned teacher's job requires moving from one school to another. Not only does this mean more travel than if she were a permanent teacher assigned to a particular school, it also means that developing meaningful relationships with colleagues and students is almost impossible because of the "constant[ ] rotat[ion] from school to school." R. 149 at 7. While the Board states that Ortega would be able to opt out of the rotation system, it specifically made this option for one year at a time and "at the discretion of the Board unit which operates the Pool." Therefore, the Court cannot say Ortega is incorrect that the reinstatement offer would require her to travel to different schools in contrast to her former permanent assignment at a single school.

---

[44] Going forward, the Court will drop the artifice of referring to an "offer to comply with a court order of reinstatement" and refer simply to the Board's offer of reinstatement.

Ortega also points out that a reassigned teacher does not have control over either the subject she is teaching or her schedule. A regularly appointed teacher's schedule includes preparation periods, but a reassigned teacher usually has to forfeit those preparation periods to substitute in other classes. R. 161 at 6 (¶ 9). A reassigned teacher does not have her own classroom, and instead fills in wherever there is a need, even when assigned to one specific school. Often this means teaching a class she might not be qualified to teach, such as math or science, or even a class like physical education that Ortega could not teach because of her disability. It could even mean she is assigned to do nothing more than clerical work. *Id.* at 5-6 (¶ 8).

Even when assigned to a specific classroom, Ortega argues the job differs significantly from the job of a regularly assigned teacher:

> To be a reassigned teacher is to be at the mercy of the students for whose teacher one is temporarily substituting. One does not have control over the emergency lesson plans that are rarely updated nor represent cohesive academic goals. There is no time before the schedule gets thrown in one[']s hands to revamp or replenish the emergency lesson plans that usually do not reflect higher order thinking and hence, contribute to classroom chaos. Most of the time a couple of students relay the last concept covered. Many times the substitute is the babysitter until the end of the class period.

*Id.* at 6 (¶ 9). Ortega also argues that teachers in the pool experience a "lower standard of treatment" because they are not the regularly assigned teacher. According to Ortega, a student who behaves poorly to a substitute suffers little by way of consequences. *Id.* at 7 (¶ 10). She tells of one instance when she was a

reassigned teacher at a high school for three weeks and a student threatened to shoot her on two different occasions if she did not give him an A,[45] and states that "[i]n the eleven and a half years at Hedges Elementary, [she] never had to file a police report." *Id.*

All of these conditions of employment lead to lack of job satisfaction, according to Ortega. "There is not an opportunity for an academic relationship to develop. The on-going rotation of classes and schedules makes it impossible to adequately use pedagogies and methods that propel individual[ ] growth." *Id.* Ortega also mentions miscellaneous matters related to job conditions, such as her belief, based on personal experience, that the union representative is not as accessible to reassigned teachers as he or she is to a tenured assigned teacher, even though reassigned teachers also pay union dues. *Id.*

Ortega's testimony is based on her own personal experience when she was in the reassigned teacher's pool from 2009 to 2010. The Board did not offer any evidence to contradict her testimony on the above points. The Court therefore has no basis to question the veracity or accuracy of Ortega's testimony, which the Court found logical and credible. Accordingly, the Court concludes consistent with Ortega's testimony that the Board's offer of reinstatement does not provide Ortega

---

[45] The Board argues Ortega's testimony about a student threatening to shoot her is inadmissible hearsay. R. 162 at 4. But a "threat" constitutes verbal conduct which falls outside the hearsay rule. *See United States v. Pate,* 543 F.2d 1148, 1149 (5th Cir. 1976) (defendant's contention that out-of-court threats against a witness "was hearsay is palpably frivolous since the words related were verbal acts and were not introduced to prove the truth of them"); *see also Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir.2007) ("Statements that constitute verbal acts (*e.g.,* . . . slander) are not hearsay because they are not offered for their truth.").

with the same conditions of employment she had when she was an assigned, tenured teacher at Hedges.

*Opportunities for Advancement.* Ortega argues that, even if she is paid the same as a tenured teacher and even if the Board allows her to opt out of the normal rotation involved in the reassigned teacher's pool, "[t]he perpetually changing schedule of a reassigned teacher does not allow for the same professional growth that assigned tenured teachers experience." *Id.* at 7 (¶ 11). "When [she] was [a] reassigned teacher, [she] was not allowed to participate in professional development and especially, outside of the school conferences, trainings or seminars," because she "was not deemed eligible or worthy to be exposed to new pedagogies, methods, textbooks, or authors." *Id.* According to Ortega,

> [a] reassigned teacher gets deprived of professional growth. A substitute or reassigned teacher does not get to teach before or after school programs. When [she] was a regularly appointed teacher at Hedges Elementary, [she] taught reading classes before and after school, oversaw the ballroom dancing classes, and taught summer school. Every summer school application that [she] submitted as a reassigned teacher, the Board made it a point to overlook. If assigned to one school a year, a reassigned teacher is not allowed to participate in a two to three year graduate cohort that represents the latest professional demands and that are subsidized by the Board and scholarships. [Ortega's] track record shows that [she] [is] frequently taking graduate courses to meet and exceed [her] professional expectations. Being a reassigned teacher would deprive [her] of access to subsidized graduate courses that are deemed necessary for employment.

*Id.* at 8-9 (¶ 13).

The Board did not offer any evidence to counter this testimony. Therefore, the Court finds that the opportunities for advancement of a reassigned teacher are not the same as a full-time assigned teacher with tenure.

*Status.* According to Ortega, a reassigned teacher is a substitute teacher by another name. And the difference in prestige between a tenured teacher and a substitute teacher is readily apparent. Among those differences to which Ortega testified is the attitude of colleagues (*id.* at 7 (¶ 11) ("colleagues . . . perceive a reassigned teacher as . . . not qualified for the job")), and the attitude of students and parents (*id.* at 6 (¶ 8) ("Students would ask 'why don't you become a teacher?'")). Ortega claims that "parents and Board employees made the assumption that something was wrong with [her]" because she was in the reassigned teacher's pool. She was embarrassed by this attitude. *Id.* ("There I was[,] a substitute with a Bachelor of Science from Northwestern University and a Master in Education from Loyola University with 60 graduate hours, while parents and other CPS teachers also wondered why I was not a tenured assigned teacher. . . . To be a tenured assigned teacher and be degraded to reassigned/substitute status was grotesquely humiliating.").

While it could be concluded that Ortega was hypersensitive to what she may only expect but does not know others are thinking, she does cite to a few specific instances in which her abilities apparently were questioned as a result of her status. In addition, the Court has no doubt based on the evidence at trial and the post-trial hearing that the status of a reassigned teacher who functions as a

substitute is less than the status of a permanently assigned teacher. Again, the Board has not offered any contrary evidence.

Despite the Board's contention that its offer of reinstatement terminated its front pay liability, the Court must conclude that the Board's offer guarantees Ortega a comparable position in terms of salary and benefits only for a limited period of four years. The Board's offer to be reinstated into the reassigned teacher's pool is not an offer of a "substantially equivalent job," within the meaning of *Ford Motor Co. See Pierce*, 65 F.3d at 575 (district court did not "abuse[ ] its discretion by finding that [the plaintiff] did not have to accept an embarrassing and less fulfilling position with the same company that discriminated against him").

### B.    ORTEGA'S REASONS FOR REJECTING REINSTATEMENT

Given the Court's finding that the Board's offer of reinstatement was inadequate, it is unnecessary for the Court to decide whether Ortega's reasons for rejecting the Board's offer are valid before moving on to the front pay calculation. Nevertheless, for the sake of completeness, the Court will address that issue as well. The Board argues that front pay should be awarded only when reinstatement is not feasible, and that Ortega's "preference for front pay over reinstatement is not a factor the Court may consider." R. 44 at 1, 6. But neither of those premises is correct.

The Board's argument derives from the frequently made observation that reinstatement is the "preferred" remedy in unlawful employment termination cases. *See, e.g., Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 792 (7th Cir.

2012). But that statement is most often made in cases where the *employee* is the one requesting reinstatement and the *employer* opposes it. In *Price v. Marshall Erdman & Associates, Inc.*, 966 F.2d 320 (7th Cir. 1992), the Seventh Circuit corrected the district court for implying that "it makes no difference whether the employee dislikes the idea of working for the employer, or the employer dislikes the idea of having the employee work for him." *Id.* at 325.[46] According to the *Price* court, "a more discriminating analysis is necessary." *Id.*

> Take first the employee's disinclination to return to working for his employer. If the disinclination is rational and sincere (rather than a maneuver to get front pay), it is a good reason for allowing the employee to elect his alternative remedy of front pay. The employer's dislike of the employee's returning is a far more problematic ground for declining to order reinstatement. This would be obvious in a case of racial discrimination in which the employer pleaded hostility to the entire group (blacks, or women, or whomever) to which the plaintiff belonged, as a ground for refusing to order reinstatement. To decline to order reinstatement in such a case would reward the employer for the very attitudes that precipitated his violation of the law, by giving him a choice of remedies.

> The intermediate case is where the employer dislikes the employee for reasons independent of the latter's membership in a protected class, and where the feasibility of awarding front pay in lieu of reinstatement makes the burden on the court of supervising a coerced employment relation between the parties disproportionate to any gains from giving the plaintiff his preferred remedy. In such a

---

[46] *See also* Susan K. Grebeldinger, *The Role Of Workplace Hostility In Determining Prospective Remedies For Employment Discrimination: A Call For Greater Judicial Discretion In Awarding Front Pay*, 1996 U. ILL. L. REV. 319, 320, 362 (1996) (reinstatement "does not always serve the interests of the victims of discrimination, the employers, or society"; front pay can serve the same remedial functions and may better serve to make a plaintiff whole in a given case).

> case a refusal to order reinstatement would be within the
> trial judge's equitable discretion.

*Id.*

The Board mostly cites to cases involving the "problematic" employer-opposed situation.[47] This case, however, involves the employee-opposed situation at issue in *Price*. And *Price* makes clear that, contrary to the Board's arguments, the employee's preference against reinstatement *is* a central factor to the decision. Further, resolution of the issue turns not on whether reinstatement is feasible but on whether the employee's preference for front pay over reinstatement is "rational and sincere." *Id.*

---

[47] In addition to *Price,* 966 F.2d at 325, other employer-opposed cases on which the Board relies include *Hicks*, 677 F.3d at 792 (upholding district court's decision to order reinstatement over the employer's objections, stating that the court "must be careful not to allow an employer to use its anger or hostility toward the plaintiff for having filed a lawsuit as an excuse to avoid the plaintiff's reinstatement") (internal quotation marks and citation omitted), and *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir. 2001) (remanding to district court for further findings where the plaintiff asked for reinstatement, stating that neither "the angry reaction of [the defendant's] management to [the plaintiff's] success before the jury, nor the plaintiff's "attorney's advocacy on behalf of his client" can be a proper basis for denying *plaintiff's* request for reinstatement) (emphasis added). One exception of an employee-opposed situation to which the Board cites is *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 678 (7th Cir. 1993). To the extent that *Rodgers* applies a somewhat different analysis of the reinstatement issue than that applied in *Price*, it still does not support the Board's argument here because the Seventh Circuit in that case merely affirmed the district court's exercise of discretion to deny the plaintiff a front pay award where the plaintiff "made no showing that it would have been infeasible or inappropriate for him to return to" his previous employment. *Id.* Here, the Court exercises its discretion to uphold a front pay award on Ortega's showing that it will be infeasible or inappropriate to order reinstatement for reasons not raised in *Rodgers* having to do with factors other than whether the former supervisor who discriminated against her is still employed by the Board.

The Board argues in favor of its offer of reinstatement by focusing almost exclusively on the fact that the principal who terminated Ortega would not be her supervisor under the Board's reinstatement offer.[48] Ortega responds that her reasons for not wanting to be reinstated go beyond any hostility between her and the former principal. According to Ortega, she suffered not only from the former principal's discrimination but from the Board's refusal over the course of many years to right the wrong committed by the principal despite Ortega's repeated attempts to have the principal's decision overturned.[49] It is Ortega's belief that not only was the Board unresponsive to her complaints, but it engaged in its own wrongful conduct, such as redefining her position after she was terminated to justify her termination after-the-fact, defaming her by representing in publicly filed documents that she was not qualified to teach middle school language arts,[50] and

---

[48] The Board represents to the Court that the person in question no longer works at Hedges or as a principal, and would not be working at any of the schools on the "high needs" list to which Ortega might be temporarily assigned.

[49] *See* R. 161 at 2 (¶ 2) ("In attempting to remedy the situation, I went through every chain of command including, but not limited to: district, CPS Board, CPS Law Department, CPS Equal Opportunity Compliance Office, CPS Office of the Inspector General, CPS Local School Council and Community Relations, CPS Business Center, Illinois Educational Labor Relations Board, CPS City of Chicago Commission on Human Relations, Illinois Department of Human Relations, Illinois State Board of Education (ISBE) Legislative Committee, ISBE Finance and Audit Committee, IRS and U.S. Department of Justice.").

[50] *See* R. 161 at 2 (¶ 2) (the Board's attorneys and agents asserted in numerous filings in administrative proceedings before various state and local agencies to whom she had complained about her termination that she "did not have the credentials to teach at Hedges" and was "not qualified" for her job).

offering to reinstate her but only if she agreed to a "dock"[51] in salary. R. 161 at 2 (¶ 2). Ortega says the Board (not just the principal) has damaged her professional reputation and standing among her peers and others within the school system with whom she would be interacting in any position to which the Board might assign her. As a result of her experiences in trying to resolve her grievance over her termination, Ortega believes the system is "rigged," and she has a deep distrust of the Board. If she were to accept the Board's reinstatement offer, she says she would be looking over her shoulder constantly and wondering what the next "conspiracy" against her would be. *Id.* at 3, 9 (¶¶ 3-4, 14). She labels the Board's treatment of her complaints of discrimination by the principal "a systematic history of abuse," which caused her to "fear. . . speak[ing]-up" and ultimately led her to conclude that "Principal Adelfio Garcia's actions *were* the acts of the Board." *Id.* at 2 (¶ 1) (emphasis added).

While the Court does not credit Ortega's testimony that the entire Board was and is likely to continue to conspire against her, the Court has no doubt that Ortega's testimony is sincere and that her feelings of distrust, lack of confidence, and trauma from her experiences with the Board (apart from her experiences with the principal) are very real. Those feelings were exacerbated by the hundreds of rejections she received of her CPS job applications following her termination from June 2010 through June 2012. The Court also believes that returning to the Board's employment as a reassigned teacher would indeed, as Ortega testified, feel to her

---

[51] Ortega does not explain what she means by a "dock" in salary, but presumably she was asked to agree to either a salary decrease or a salary freeze.

like "insult to injury." *Id.* at 10 (¶ 15). Given that Ortega's feelings are sincere, the only additional question is whether they are a valid legal basis for rejecting the Board's offer of reinstatement.

The Board argues Ortega's feelings are not a valid basis for turning down reinstatement because they are not justified by actual, currently existing workplace hostility. But several courts have rejected that argument. *See, e.g., Stafford v. Elec. Data Sys. Corp.,* 749 F. Supp. 781, 785 (E.D. Mich. 1990); *Eivins v. Adventist Health Sys./E. & Middle Am., Inc.,* 660 F. Supp. 1255, 1263 (D. Kan. 1987). Instead, "courts have determined that reinstatement is not practicable—and, thus, not a viable remedy—in cases where, as here, even though there is no evidence of open hostilities between the defendant-employer and the plaintiff-employee . . ., there is evidence that the employer-employee relationship has been irreparably damaged as a result of the post-discharge litigation." *Stafford*, 749 F. Supp. at 785-86.

In one case, the Third Circuit rejected the argument that animosity did not prevent reinstatement because the supervisors who discriminated against the plaintiff were no longer employed by the defendant. *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823 (3d Cir. 1994). The Third Circuit held that, although the plaintiff initially had requested reinstatement, his request after trial to have reinstatement excluded as a potential remedy was properly granted by the district court over the defendant's objections due to the district court's finding of "irreparable distrust and animosity" that had developed between the plaintiff and the defendant "as a result of the events prior to [the plaintiff's] termination, the termination itself, *and the*

*litigation that followed in its wake.*" *Id.* at 832 (internal quotation marks omitted, emphasis added); *see also U.S. Equal Emp't Opportunity Comm'n v. E.I. Du Pont de Nemours & Co.*, 406 F. Supp. 2d 645, 662 (E.D. La. 2005) (citing to the plaintiff's evidence that her employer "recklessly disregarded [her] rights under the ADA," and "maintained throughout the course of the litigation that [she] [was] not qualified to work at [the defendant]"), *aff'd in part, rev'd in part on other grounds*, 480 F.3d 724 (5th Cir. 2007).

In another case, the plaintiff conceded the lack of "'open hostilities' between himself and former [ ] co-workers/supervisors," but argued that any honest and trusting employer-employee relationship he may have had with [his former employer] and its managerial personnel during the course of his employment ha[d] been irreparably severed as a result of th[e] litigation." *Stafford,* 749 F. Supp at 783. The court found the plaintiff's contention to be "supported by [his] trial testimony." *Id.* Thus, even though the defendant-employer "stated that it [was] willing to reinstate [the plaintiff] to a 'substantially similar' position at a different [ ] facility from that at which [the plaintiff] previously was employed, and that [the plaintiff] would be working for different supervisors . . ., the [c]ourt [was] not persuaded that such an approach would be practicable." *Id.* at 786.

> The Court does not believe it could order Plaintiff back to work . . . even at a different [ ] facility, and expect him to have any realistic chance of future success. Such a placement would leave both parties "walking on eggshells" *ad infinitum*—Plaintiff worrying about how new supervisors would react to having someone working for them who has already sued the company because of prior supervisors' conduct, and EDS having to be

> concerned with the potential of being charged with
> retaliating against Plaintiff as a result of his having
> previously sued the company every time Plaintiff's
> supervisors criticized his work. Reinstatement of Plaintiff
> to employment at EDS under these circumstances . . .
> "would be a harbinger of disaster and a catalyst to more
> litigation."

*Id.* (internal citations omitted).

In an attempt to directly address Ortega's loss of faith in the Board as an employer, the Board's offer of reinstatement includes a provision that if Ortega believed she was being treated unfairly, she could appeal directly to the Board's attorney in these post-trial proceedings, who represented to the Court she would personally assume responsibility for resolving the issue. While the Court appreciates the motivation behind this promise, Ortega is entitled to question (as she does) the ability of the Board's counsel to advocate on her behalf, or, at the very least, to act in a neutral capacity as opposed to in the bests interests of the Board. Moreover, in the end, the Board is suggesting the exact sort of thing that the Seventh Circuit (and the *Stafford* court, above) recognized was a good reason for denying reinstatement:

> If Price is reinstated, every time he is denied credit for a
> sale, or denied a raise or a bonus, or has a squabble with
> Halverson, he will be tempted to run to the district court
> for further equitable relief ancillary to the reinstatement
> order or even for a finding of contempt of the order. There
> is an analogy to the common law's refusal to grant specific
> performance of a contract of employment. A federal
> district court is not equipped to be the labor relations
> equivalent of a domestic relations court. Reinstatement in
> the circumstances that we have described would be
> justified *only if* front pay *could not* be computed.

*Id.* at 325-26 (emphasis added).

Aside from the practicality of reinstatement in these circumstances, several courts also have recognized that reinstatement may not be viable "because of psychological injuries suffered by the plaintiff." *Abuan v. Level 3 Commc'ns, Inc.,* 353 F.3d 1158, 1176 (10th Cir. 2003) (internal quotation marks and citation omitted); *see also E.I. Du Pont de Nemours & Co.,* 406 F. Supp. 2d at 662 ("The emotional baggage that [the plaintiff] carries as a result of [the defendant's] discrimination may affect her work performance to such an extent that reinstatement is not an adequate remedy."); *Eivins,* 660 F. Supp. at 1262, 1263 (ordering front pay over reinstatement upon finding that "'a productive and amicable working relationship [between the plaintiff and the defendant] would be impossible,'" because, among other things, the "plaintiff testified, and the evidence indicated, that his self worth was crushed by his dismissal," and, as a result, "it would be extremely difficult, if not completely unreasonable, to expect diligent work and loyalty to the defendant").

Like the plaintiffs in the above cases, Ortega's perceptions about the Board's post-termination conduct, whether accurate or not, may be sufficiently strong and extreme as to render reinstatement an inadequate remedy, because her perceptions have destroyed her "ability to be an effective member of Defendant's workforce." *Abuan,* 353 F.3d at 1178; *see also Price,* 966 F.2d at 325 (finding that the "lawsuit irrevocably impaired [the plaintiff's] ability to function as an auditor at [the defendant]"). This Court concludes, as another court did, that "the strongest factor

65

disfavoring reinstatement" is Ortega's testimony that the Board's post-termination conduct had a "devastating impact . . . on her self-esteem and self-worth," and that "[r]einstatement under these conditions would be counter-productive to [the Board] and an empty remedy to [Ortega]." *Ogden,* 29 F. Supp. 2d at 1016; *see also Baker*, 263 F. Supp. 2d at 1173 (plaintiff's testimony demonstrates "that it would be unjust and insensitive to place her back in the workplace").[52]

## C.   AMOUNT OF FRONT PAY AWARD

Front pay begins when back pay ends (date of judgment) and continues for whatever period of time will make the plaintiff whole. *Barbour v. Merrill*, 48 F.3d 1270, 1279-80 (D.C. Cir. 1995), which is to say, through the date "when the sting of discrimination has passed and the victim has had a reasonable amount of time to secure comparable employment," *Barbour v. Medlantic Mgmt. Corp.*, 952 F. Supp.

---

[52] Ortega testified that she does not want to leave her current job with the state government because her "skill set is not in question," she "meet[s] and/ or exceed[s] [her employer's] expectations, and she does "not feel [she] ha[s] to look over [her] shoulder on a daily basis." R. 161 at 9 (¶ 15). In some circumstances, similar testimony might be a basis for saying that the employee voluntarily chose a different career, which would warrant a denial of front pay. But here, Ortega's choice to pursue a lower paying career must be viewed in light of the fact that "[d]efendant's conduct caused [her] shift in career goals." *Baker*, 263 F. Supp. 2d at 1174. The testimony is clear that Ortega wanted to be and would have remained a teacher but for the Board's conduct in discriminating against her because of her disability. Ortega testified that despite dedicating her life to teaching and education, she lost her economic means and much of her self-worth because of the principal's discrimination against her. The Board is now asking her to give up her career advancement in her new job with the state government, however limited, in order to accept a temporary assignment in a lessor position as a substitute teacher with no guarantees of a permanent job thereafter, so that the Board does not have to pay front pay for the four-year period of time requested by Ortega. Given these circumstances, the Court believes that Ortega's stated preference for remaining in her current, lower paying job counsels in favor of, not against, an award of front pay in lieu of reinstatement.

857, 866 (D.D.C.), *aff'd sub nom. Barbour v. Merrill*, 132 F.3d 1480 (D.C. Cir. 1997).

*See Williams*, 137 F.3d at 954 (front pay awards typically are limited in duration, depending on when the plaintiff did or could "reasonably be expected to have moved on to similar or superior employment"); *Gracia*, 130 F. Supp. 3d at 1255 (front pay continues until "some reasonable point in the future"). Although "[d]amages in employment discrimination cases are not intended to insure a plaintiff's future financial success," *McKnight II*, 973 F.2d at 1372, front pay awards are by their nature fashioned amidst some degree of speculation, *Williams,* 926 F. Supp. at 791. While an award of front pay "must be grounded in available facts, acceptable to a reasonable person and not highly speculative," the district court nevertheless has "very considerable discretion . . . in considering the question." *Downes v. Volkswagen of Am., Inc.,* 41 F.3d 1132, 1142 (7th Cir. 1994).

The plaintiff bears the initial burden of providing the district court "with the essential data necessary to calculate a reasonably certain front pay award," including "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." *McKnight II*, 973 F.2d at 1372. "In deciding whether to award front pay, the court considers such factors as whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intended to work or was physically capable of working and whether

liquidated damages have been awarded." *Id.* at 1141.[53] "The longer the front pay period, the more speculative the front pay award." *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir. 1990) (quoting *Rengers v. WCLR Radio Station*, 661 F. Supp. 649, 650 (N.D. Ill. 1986), *aff'd sub nom. Rengers v. WCLR Radio Station, a Div. of Bonneville Int'l Corp.*, 825 F.2d 160 (7th Cir. 1987), *cert. granted, judgment vacated sub nom. on other grounds WCLR Radio Station v. Rengers*, 486 U.S. 1020 (1988)); *see also Graefenhain*, 870 F.2d at 1205 (front pay award may be "highly speculative due to the lengthy period for which damages are sought and the lack of certainty that plaintiff would have remained employed during such a lengthy period").[54] Nevertheless, courts have made front pay awards for lengthy periods of time, through retirement age in certain cases, where the evidence supported it. *See, e.g., Pierce*, 65 F.3d at 574 (affirming ten-year front pay award until plaintiff's retirement age of 65); *Washington v. Office of the State Appellate Def.,* 2016 WL

---

[53] *See also Baker,* 263 F. Supp. 2d at 1176-84 (factors courts will consider in making a front pay determination include the plaintiff's age; the length of time the plaintiff was employed by the defendant employer; the likelihood the employment would have continued absent the discrimination; the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment; the plaintiff's work and life expectancy; the plaintiff's status as an at-will-employee; the length of time other employees typically held the position lost; the plaintiff's ability to work; the plaintiff's ability to work for the defendant-employer; the employee's efforts to mitigate damages; and the amount of any liquidated or punitive damage award made to the plaintiff); *Ogden,* 29 F. Supp. 2d at 1017-19 (same).

[54] A lengthy award of front pay *combined* with a liquidated damages award is particularly inappropriate. *See Hybert,* 900 F.2d at 1056. Here there is no liquidated damages award to factor into the equation.

3058377, at *9-10 (N.D. Ill. May 31, 2016) (awarding eight years of front pay, to bring plaintiff to the current Social Security retirement age of 66).[55]

Ortega testified that prior to her termination she intended to work as a teacher, and, specifically, for the Board, until retirement age. Although there was no expert testimony on the typical retirement age for a CPS teacher, Ortega testified she anticipated retiring, like many CPS teachers, in her mid-fifties. *Id.* at 241. Ortega was born on June 26, 1974. She was twenty-three years old when she began working for the Board in January 1998, and thirty-six when she lost her full-time salary as a tenured teacher at Hedges. She will be fully compensated for her losses through her current age of forty-three pursuant to this Court's back pay ruling. To add to that amount compensation through a projected retirement age of 55, the Court would have to award Ortega an additional twelve years of front pay. Recognizing the difficulties involved in seeking a potentially speculative front pay award through the date of her anticipated retirement from the Board, Ortega presents what she says is a reasonable alternative. Ortega asks for an award of front pay through the earlier date on which her pension would have vested, on the

---

[55] *See also Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009) (front pay award for ten years was not an abuse of discretion, especially "where an advisory jury recommended front pay for 25 years"); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004) ("KAPL wholly fails to demonstrate why the district court abused its discretion in choosing time periods between nine and twelve and a half years as the front pay period for plaintiffs who already had taken substantial steps to mitigate their damages."), *vacated on other grounds sub nom. KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (award of front pay for period of ten years not an abuse of discretion).

theory that, at the very least, she would not have retired before then. *See* R. 149 at 9; R. 139 at 259 (Tr. Transcript 323).

Neither party provides the Court with an exact pension vesting date. It is undisputed, however, that Ortega's pension would have vested had she not been terminated on or about her 20 year service anniversary date. The evidence showed that Ortega was first employed by the Board on January 28, 1998, so if that date were the date for when the pension vesting period began to run, vesting would occur on January 28, 2018. But the Board represents that when Ortega's full salary and benefits were terminated in June 2010, she had worked for the Board for eleven years, R. 144 at 8, which means, had she not been terminated, she could have anticipated her pension vesting approximately nine years later or sometime in 2019. Since both parties appear to agree that the correct date is approximately four years after the date of trial (which concluded on October 19, 2015), the Court will use October 31, 2019 as the pension vesting date.

Pursuant to the Court's discussion on the back pay issue earlier in this opinion, Ortega will be receiving back pay through November 30, 2017. Therefore, if Ortega's pension-vesting date is chosen for termination of the front pay award, Ortega would be entitled to front pay for a period of 23 months (December 1, 2017 through October 31, 2019).

The Court concludes that Ortega's request for 23 months in front pay is reasonable and not overly speculative. In *Pierce*, the Seventh Circuit upheld an award of front pay for a period of ten years based on the plaintiff's testimony that

his intention had been to work until his retirement. 65 F.3d at 574. The district court found that the plaintiff "'was as likely as any and probably more likely than most to work to retirement if he had had the ability to do that' because his job was of 'immense importance' to him and was 'the main source of his sense of who he was and his pride.'" *Id.* The Seventh Circuit said that the district court was justified in relying on the plaintiff's testimony concerning how long he had planned to work for the defendant because it was supported by the defendant's "normal retirement age" and the fact that "an employee would receive reduced retirement benefits if he resigned before that time." *Id.* While only one-half of the defendant's employees "actually worked to that age, the [district] court gave specific reasons why it believed [the plaintiff] would have been one of those employees." *Id.; see also Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 729 (2d Cir. 1984) (district court "was within [its] discretion in allowing front pay for the full period from trial until [the plaintiff] would reach age 70, when compulsory retirement could be imposed without violating the ADEA," because the four-year time period "was relatively short . . . and thus did not involve some of the uncertainties which might surround a front pay award to a younger worker").

Similarly, here, the Court find's Ortega's testimony that, given her qualifications, exemplary job performance, and thirteen years of experience as a teacher at Hedges, it was realistic for her to expect to have worked as a teacher with CPS through her retirement age to be credible. The Court credits Ortega's commitment to teaching, her testimony that she derived much of her self-esteem

from her position as a tenured teacher, and her incentive to continue in her teaching position until her pension would have vested, as justifying using, at a minimum, her pension-vesting date as the date through which front pay should run. In addition, the Court considers other factors, such as the relatively short 23 month period between now and the vesting date, Ortega's age, and the longevity of her employment with the Board prior to her termination, as justifying a front pay period through the pension-vesting date.[56]

The Board has taken a two-prong approach in arguing that the front pay award sought by Ortega is unduly speculative. First, the Board argues that Ortega has a reasonable prospect of obtaining comparable employment sooner but for her failure to mitigate her damages. "When a defendant's front pay objection is predicated upon the same objections regarding mitigation of damages which we have rejected with regard to back pay, we reject the front pay argument as well." *Donlin*, 581 F.3d at 86; *see also Washington,* 2016 WL 3058377, at *9 ("Despite her efforts to find comparable employment, Washington has failed to do so, earning less than her OSAD salary in every year since she resigned."). It is speculative to say that Ortega would likely be able to find a permanent teaching position if she kept looking in the next few years, particularly in light of her more than three hundred previous applications for such a position, all of which were rejected. In addition,

---

[56] *Compare Equal Emp't Opportunity Comm'n v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998) (five years front pay was too long for employees who had worked for the defendant for nineteen months or less); *Tennes v. Com. of Mass., Dep't. of Revenue*, 944 F.2d 372, 381 (7th Cir. 1991) (no abuse of discretion in refusing front pay where defendant had high turnover rate and plaintiff had poor employment record).

while the Board claims there are comparable positions available to Ortega, it also suggests that future lay-offs are expected because of the poor financial condition of the State and the Pension Fund.[57] Moreover, Ortega is now an older employee who commands a higher teaching salary than younger teachers more recently entering the profession, and therefore is less likely to be able to compete effectively for more limited positions. *See Blum v. Witco Chem. Corp.,* 829 F.2d 367, 374 n. 6 (3d Cir. 1987) ("Statistics show that older workers have far more difficulty finding new jobs than their younger counterparts.").

Second, the Board also argues the opposite, namely, that Ortega would likely have been laid off prior to her pension vesting date. The Board's present contention that Ortega might have been subject to lay-off from the Board unrelated to discrimination is unsupported by any evidence in the record; the only mention regarding possible future teacher lay-offs was in questions posed by the Board's counsel, which is not evidence. The Board presents no evidence to show a reasonable probability that the Board's current financial condition has resulted in teacher lay-offs that likely would have affected Ortega's tenured employment had

---

[57] It is not contradictory to say that future anticipated lay-offs make the prospect of Ortega currently getting a job with the Board speculative, while at the same time saying, as the Court does in a moment, that current lay-offs do not affect the likelihood that Ortega would have continued to work for the Board had she not been fired. The two situations are different, the first dealing with the effect of lay-offs on Ortega's current, actual position of not having a permanent teaching job, and the second dealing with the effect of lay-offs on the hypothetical situation Ortega would have been in had she not been terminated.

she not been terminated.[58] Although the Board failed to introduce any evidence on the point, the Court recognizes media reports that the Board currently is experiencing some degree of a financial crisis resulting in lay-offs of teachers and other school support staffers. *See http://chicago.suntimes.com/chicago-olitics/cps-lays-off-950-including-356teachers -delay (8/7/17)*. At the same time, however, the number of teacher lay-offs cited in the newspaper report is relatively small, and it would be unlikely that Ortega would have been among those first laid off given her seniority. Giving due regard to the "inherent difficulty of calculating damages for things that might have—but have not, in fact—occurred," *Downes,* 41 F.3d at 1142,[59] the Court finds that, absent the Board's discrimination, it is more likely than not that Ortega would have remained in her tenured teaching position through her twentieth anniversary of the start of her employment with the Board.

As the Board's only objections to front pay lack merit, the Court will award Ortega front pay through October 31, 2019.

Turning to the calculation of the 23 month front pay award, the fact that Ortega's actuary did not testify regarding the amount of a front pay award does not

---

[58] *Compare Hathaway v. New Dimension Ctr. for Cosmetic Surgery*, 2006 WL 1594060, at *2-6 (N.D. Ill. June 6, 2006) (where court limited back pay award to date on which the plaintiff likely would have lost her job with the defendant due to the fact that the defendant ceased to operate business after that date).

[59] In *Downes*, 41 F.3d at 1143, the court held it was proper to award three years of front pay although the defendant had reduced its workforce by sixty percent, including three of the seven positions the plaintiff held, and was restructuring. And in *Pierce* 65 F.3d at 574-75, the court rejected the defendant's assertion that the district court should have reduced the front pay award because of the corporation's shaky future, notwithstanding evidence of "a failed merger two years prior to [the plaintiff'] termination and one newspaper article about a possible future merger."

prevent this Court from using his testimony to make its own front pay calculation. *See Downes*, 41 F.3d 1132, 1142-43 (affirming where the district court based its front pay calculation on estimates derived by one of the plaintiff's experts at trial (an actuary), who testified only as to back pay calculations). The first step in calculating Ortega's front pay is to determine what her annual salary would have been for the years in question. Earlier in this opinion, the Court calculated Ortega's salary for the 2017-2018 school year less Ortega's pension contribution as $97,410. Using this figure, the Court calculates Ortega's gross lost wages from December 2017 through June 2018 (7 months) as follows: $97,410 x 7/10 = $66,187.

As discussed previously in this opinion, the Court will add a two percent pay increase for each of the following school years (2018-2019 and 2019-2020), and then subtract Ortega's required pension contribution of 2 percent to arrive at an annual salary figure to use in calculating a gross lost wages for the remaining two years in which front pay will be awarded:

| Academic Year | Annual Salary | Employee Pension Contribution | Net Annual Salary [annual salary less pension contribution] |
|---|---|---|---|
| August 2018– June 2019 | $101,386 [$99,398 + 2%] | $2,028 | $99,358 |
| August 2019- June 2020 | $103,414 [$101,386 + 2%] | $2,068 | $101,346 |

Thus, Ortega's gross lost wages for August 2018 through June 2019 is $99,358, and her gross lost wages for August 2019 through October 2019 (three months) is $101,346 x 3/10, or $30,404.

To arrive at a total front pay award, the Court must subtract Ortega's anticipated actual wages in the applicable time period from her gross lost wages. The Court will start with the actual earnings figure it previously used for the 2016-2017 academic year of $53,212, and apply an additional 2 percent increase for each year thereafter. This results in $54,276 for Ortega's actual earnings in the 2017-2018 school year; $55,362 for Ortega's actual earnings in the 2018-2019 school year; and $56,469 for Ortega's actual earnings in the 2019-2020 school year.

Applying these calculations leads to the following summary of Ortega's front pay award:

| Period | (a) Projected Gross Lost Wages | (b) Projected Actual Earnings | (a) – (b) Net Front Pay Amount |
|---|---|---|---|
| December 2017 through June 2018 | $66,187 | $37,993 [$54,276 x 7/10] | $28,194 |
| July 2018 through June 2019 | $99,358 | $55,362 | $43,996 |
| July 2019 through October 2019 | $30,404 | $16,941 [$56,469 x 3/10] | $13,463 |

Ortega's total front pay award is $85,653. The Court will apply the present cash value rate suggested by Ortega of 2.5% (to which the Board offers no objection), to arrive at a discounted front pay award of $83,512.

PENSION BENEFITS

The Seventh Circuit has said that, "[i]n order to make plaintiffs whole, a discharged employee should be compensated for pension benefits lost through the

wrongful termination." *Graefenhain*, 870 F.2d at 1212; *see also Loeb v. Textron, Inc.,* 600 F.2d 1003, 1021 (1st Cir. 1979) ("Pension benefits are part of an individual's compensation and, like an award of back pay, should be awarded."). "If a prevailing plaintiff is returned to the defendant's employment, this award will consist of payments to the pension fund on plaintiff's behalf, bringing plaintiff's pension interest to the level it would have reached absent discrimination." *Loeb*, 600 F.2d at 1021. But because the Court has not ordered reinstatement here, it has two options for Ortega's lost pension benefits award.

The first option is to award Ortega "whatever would have been paid into the pension fund on [her] behalf." *Id.* The Board appears[60] to use this method of calculating Ortega's lost pension benefits. At the same time, the amount of lost pension benefits suggested by the Board does not appear to take into account the portion of Ortega's pension contributions that would have been automatically withheld from her salary (and thus excluded from the projected salary figures used in this opinion).[61] If the Board's methodology were to be adopted, those amounts would need to be added to Ortega's lost pension benefits award. The Board only

---

[60] The Board offers no argument or discussion as to how it calculated Ortega's lost pension benefits or why it chose the method it did.

[61] The Public School Teachers' Pension and Retirement Fund of Chicago ("the Fund") was created by the Illinois legislature to administer the pension and retirement fund for Chicago public school teachers and other members. The Pension Code provides that revenues for the Fund "shall be comprised of contributions from at least four sources: (1) deductions from teachers' salaries; (2) employer contributions; (3) appropriations from the State, and (4) earnings on investments." *Bd. of Trustees of Pub. Sch. Teachers' Pension & Ret. Fund of Chi. v. Bd. of Educ. of City of Chi.*, 978 N.E.2d 692, 694 (Ill. App. 2012) (citing 40 ILCS 5/17–127).

accounts for its 7 percent contribution to the pension fund, when the proper total is 9 percent of Ortega's projected gross wages (7 percent employer contribution plus 2 percent employee contribution).

The second option is for the Court to treat Ortega as a vested employee entitled to receive a pension award based on employment from when she was first hired until damages are settled, and to liquidate her pension benefits as of that date. *Loeb*, 600 F.2d at 1021. Even though Ortega is not yet vested in her pension, the Court can treat her as vested for purposes of the pension award because the Board should "not be allowed to stand on [vesting] requirements that plaintiff cannot meet because of the employer's own wrongful acts." *Id.* Under this approach, the Court "should approximate the present discounted value of plaintiff's interest." *Id.* Just as with back pay, the award should be computed as if plaintiff had been employed until the date damages are settled." *Id.*

Ortega seeks an award of pension benefits using this second approach. That is, she seeks an award of the present value of her lost pension benefits incurred as a result of her termination, and she presented the testimony of her actuary to support that award. R. 184 at 110. The formula used by the actuary to arrive at his estimate of Ortega's lost pension benefits was based on an annual salary figure he calculated according to the governing rules of the Fund. To apply those rules, the actuary had to make certain assumptions about what Ortega's future salary would have been had she not been terminated. After making those assumptions and applying the formula, the actuary arrived at an average annual salary figure of $93,891. Ortega's

anticipated pension amount is based on that average annual salary figure. R. 184 at 113. According to the actuary, this average salary figure led to a monthly pension benefit amount of $2,927.

The Court rejects the Board's approach to calculating Ortega's pension benefits because it does not come close to placing Ortega in the same position she would have been in had she not been unlawfully terminated. Instead, the Court concludes that the second approach used by Ortega's actuary is the more appropriate method for calculating Ortega's lost pension benefits in this case. As the Seventh Circuit has said, pension benefits are "an integral part of an employee's compensation package" and of "paramount importance . . . to an employee's future financial security." *Graefenhain*, 870 F.2d at 1212. "An employee illegally discharged near the end of his working career is particularly vulnerable to suffering economic injury in the form of lost pension benefits. If he secures subsequent employment, he will often be unable to work the number of years that are required for vesting under the new employer's pension plan, and thus he will receive no pension benefits for his last few years of employment." *Id.* (quoting *Blum*, 829 F.2d at 374 (citation and footnotes omitted)). It is true that a cash-out pension award such as that to which the actuary testified provides Ortega with a benefit she would not have received but for her termination. Not only does she receive her entire pension in one lump-sum, but she receives it now rather than later, and she does not have to bear any risk of uncertainty regarding future funding abilities of the

Pension Board.[62] Thus, actually awarding Ortega the monthly pension benefits she would have received when she would have received them had she not been terminated would have most closely approximated Ortega's losses without making her better off as a result of her termination. The monthly payments of $2,927 would not begin until Ortega reaches retirement age, and they would run through her actual death (which may occur sooner or later than the average reflected by the mortality tables). The parties might have tried to reach some sort of agreement to this effect as happens in most cases this Court has heard on this issue, but they did not. Given the importance of pension benefits, however, the Court must err on the side of ensuring full compensation for Ortega's lost pension benefits, and, accordingly will grant Ortega a lump-sum, cash-out award as suggested by the Fifth Circuit in *Loeb*, 600 F.2d at 1021.

The actuary calculated the amount of Ortega's lost pension benefits to be $515,990. He arrived at that figure by assuming Ortega would have started to receive her pension at the age of 62, and used a mortality table to estimate the total period of time for which the monthly pension would have been payable. He then added up each monthly payment and discounted the total to its present value using the discount value of 2.5 percent for the first 20 years and 2.85 percent thereafter. R. 184 at 114. Because the actuary has provided the Court with a reasonable basis to calculate a cash-out pension award, and the Board does not present any evidence

---

[62] *Compare Gracia*, 130 F. Supp. 3d at 1260-61 (explaining how the true value of a plaintiff's contributions to a 401(k) plan is not necessarily the equivalent of non-deferred, cash in hand because the contributions receive favorable tax treatment only when their distribution is deferred).

to contradict the actuary's calculations, the Court finds that Ortega has met her burden of proof on establishing an amount for her lost pension benefits. The actuary's calculations were based on higher salary figures than the ones adopted by the Court in this opinion. Nevertheless, the difference is only slight and those slightly higher figures are more than offset by the fact that the actuary used an earlier settlement date for calculating Ortega's lost pension benefits than that to which Ortega otherwise would have been entitled.[63]

The Board raises essentially four arguments challenging Ortega's right to receive the discounted value of her lost pension benefits: (1) Ortega will receive monthly social security that she would not otherwise have received as a retired teacher; (2) the actuary's calculations allow Ortega to keep the $60,419 she cashed out from her pension after her employment was terminated; (3) Ortega has suffered no pension loss because she can repay her cashed-out Board pension with funds from her back pay judgment, and then use the Retirement Systems Reciprocal Act ("Reciprocal Act") to revive that pension and vest immediately in her state pension;

_____

[63] Technically, Ortega would have been entitled to pension benefits as part of both her back pay and front pay awards, which would have made October 31, 2019 the appropriate settlement date for her lost pension benefits. Ortega originally requested that the Court award her both past and future pension benefits using the date on which her pension would have vested as the settlement date. *See* R. 157 at 1-2. She then retreated from that position and stated she sought an award of lost pension benefits as part of a back pay award running through the date of judgment only. In her final submission, she has sought lost pension benefits based on her actuary's calculations, which assumed employment only through the August 15, 2016 equitable relief hearing. A later settlement date such as the date of judgment would have resulted in a longer period of employment on which to base the pension amount resulting in a larger lost pension benefits award. By assuming employment with the Board only through August 15, 2016, Ortega is seeking to recover less than her actual lost pension benefits even insofar as her back pay award is concerned.

and (4) the actuary failed to account for pension benefits Ortega will receive from her current position with the state government. *See* R. 185 at 3. All of these arguments are presented in a conclusory manner with little or no discussion or citation to supporting legal authority. Accordingly, the Court finds that the Board has waived any basis for arguing against the actuary's pension findings. *See Equal Emp't Opportunity Comm'n v. Perkl*, 2000 WL 1339288, at * 20-21 (W.D. Wis. Mar. 14, 2000) (undeveloped arguments, whether made at the trial or appellate level, generally are waived).

Even if the Court were to consider the Board's arguments, it likely would find that they lack merit. On the first issue, social security payments are collateral to pension benefits, and under the collateral source rule the Court does not take those payments into account in determining the proper award of employment discrimination damages. *See O'Grady,* 857 F.2d at 389-90. In addition, the actuary testified that any social security benefit to which Ortega potentially would be entitled as a result of no longer working for the Board would likely not be realized. *See* R. 184 at 138-39.

On the second issue, Ortega testified she took a cash pay-out from her teacher's pension fund in the amount of the $60,419 because of the financial stress she was experiencing after being terminated from her job. R. 184 at 162-63. The actuary testified that he took into account the cash payout by reducing his net pension loss amount by the amount Ortega received from the payout. *Id.* at 114-15.

The actuary also testified that if Ortega had not taken the cash payout, her net pension loss would have been reduced to only $169,273 (as opposed to the $515,990 cash out value he was estimating it to actually be). An argument could be made that Ortega should be responsible for the higher pension loss she incurred because she voluntarily cashed in the pension. But the Court is not convinced of the merits of that argument. For example, in *Hillmann v. City of Chicago*, 14 F. Supp. 3d 1152 (N.D. Ill.), *on reconsideration in part*, 66 F. Supp. 3d 1109 (N.D. Ill. 2014), *and aff'd in part, rev'd in part on other grounds and remanded*, 834 F.3d 787 (7th Cir. 2016), the defendant argued "that any injury Plaintiff suffered as a result of withdrawing the money in his pension account was too remote and unforeseeable a consequence to have been caused by his termination, and the [defendant] is not liable." *Id.* at 1195. The district court held that the jury considered the defendant's argument and, "presented with Plaintiff's testimony that he withdrew his entire pension contribution because he needed that money, along with loans from relatives, in order to pay bills after his termination, . . . [it] evidently determined that Defendant was liable for his loss." *Id.* The court held that it did not have good cause to disrupt the jury's determination of the defendant's responsibility for the plaintiff's pension loss caused by his need to withdraw the pension money to pay his bills after his unlawful termination. *Id.* In addition, at the time of Ortega's withdrawal, her pension was not yet vested; she therefore did not cause any actual loss in her pension rights by withdrawing the funds to which she was otherwise entitled. The loss comes about only as a result of this Court's determination

following a jury verdict in Ortega's favor that, as a remedy for the Board's unlawful discrimination, Ortega's pension will be "deemed" vested, in effect, giving her pension rights that had prematurely been cut off. It would be unreasonable to expect Ortega to have anticipated that remedy and thereby preserve her rights to it by not withdrawing the cash balance in her pension account.

In any event, the Board's argument regarding Ortega's withdrawal of funds from her teacher's pension all but ignores the question of whether the Board or Ortega should bear the burden of the higher loss occasioned by Ortega's withdrawal of her retirement funds. Instead, the Board's primary argument is that Ortega could mitigate the loss caused by her withdrawal of the pension funds by relying on the Reciprocal Act. According to the Board, the Reciprocal Act allows a person like Ortega who works for multiple public entities over time to patch together the necessary service credits to vest in her pension though service at more than one agency. R. 184 at 142.[64]

In the first place, the actuary testified that even if Ortega took advantage of the Reciprocal Act, she still would suffer a pension loss in the amount of approximately $169,273. R. 184 at 114-15. Based on the actuary's testimony, the Court finds that, at the very least, Ortega would be entitled to recover $169,273 in lost pension benefits, not zero pension benefits as the Board argues. More

---

[64] *See* 40 ILCS 5/20-101 ("Continuity and preservation of pension credits. There is established a plan for the continuity and preservation of pension credit, in accordance with the provisions hereof, in the case of employees transferring employment from one governmental unit to another. The purpose of this plan is to assure full and continuous pension credit for all service in public employment which is covered by a retirement system.").

problematic for the Court, however, is the fact that the Board did not actually present any evidence to establish that Ortega satisfied all the technical requirements of the Reciprocal Act to avoid any pension losses other than the $169,273 to which her actuary testified. Thus, the Court cannot say based on the current record that Ortega in fact would be able to reestablish her pension along the lines argued by the Board. While the Board's counsel asked Ortega's actuary questions suggesting Ortega's losses could be avoided through use of the Reciprocal Act, questions of counsel are not evidence. And the actuary's testimony in response to those questions confirms the Reciprocal Act's application in only the broadest terms. No actual analysis of whether Ortega could in fact satisfy the requirements of the Reciprocal Act was performed. For instance, the Board could have presented expert testimony of the State Employees Retirement System demonstrating the application of the Reciprocal Act to Ortega's current state pension. This is an issue of mitigation on which the Board bears the burden of proof, as opposed to an issue of damages on which Ortega bears the burden of proof. Accordingly, the Court must conclude that, in the absence of affirmative evidence that Ortega could mitigate her pension loss in the manner suggested by the Board, the Board has failed to meet its burden of proof on the Reciprocal Act mitigation issue.

The only other issue raised by the Board is whether the actuary properly accounted for any pension benefits Ortega will receive from her current job with the state government. In *Graefenhain*, the Seventh Circuit recognized that "'[pension] benefits may not be available where an award would make a plaintiff more than

whole, such as . . . where [the] defendant can prove that the new employer's pension plan would provide plaintiff with approximately the same benefit he lost due to the defendant's discriminatory firing.'" 870 F.2d at 1212 (quoting *Blum*, 829 F.2d at 373). The actuary testified that he accounted for Ortega's state pension fund by applying a $6,497 offset to Ortega's estimated lost teacher's pension benefits, an amount which represents Ortega's total contributions to the State Employees' Retirement System through the settlement date of August 15, 2016 used by the actuary. *See* R. 184 at 114-15. In other words, while the actuary chose the second method of cash-out value for calculating Ortega's pension loss from her teacher's pension, he used the first method of adding together contributions made to the fund in calculating Ortega's pension benefits from her current job. He testified this approach was proper because Ortega was not vested in her state pension fund as of the settlement date of August 15, 2016. Because he could not predict whether she would ever become entitled to future pension payments from the state fund, he did not account for such potential payments in his lost pension benefit calculations and instead only credited her with the funds put in and which she would be entitled to take out if she left her current state government job without the pension ever vesting. *See* R. 184 at 137.

There is some logic to the actuary's approach. Whether Ortega ultimately becomes entitled to future pension benefits from her current state pension is presently unknown, dependent on whether she remains employed in her current job long enough for that pension to vest. The most recent statement in the record from

Ortega's state pension account dated June 30, 2016 indicates that her state pension will vest with eight years of service, that she had 38 months of service credit as of the June 30, 2016 statement date, and that if her pension ultimately does vest, she will receive a pension in the amount of $1,691 per month. If the Court were to offset the actuary's $2,927 lost monthly benefit amount with the $1,691 pension benefit Ortega will gain if she becomes entitled to her state pension, then her lost pension benefit from her job with the Board would only be $1,236 per month. The anticipated vesting date for Ortega's state pension is in approximately 3.5 years (on or about May 1, 2021).

On the one hand, if the Court awards Ortega the full amount of her pension loss to which the actuary testified, it runs the risk of over-compensating Ortega should her state pension ultimately vest. On the other hand, if the Court awards Ortega the amount of her pension loss to which the actuary testified less the amount of her expected state pension, it runs the risk of under-compensating Ortega should her state pension ultimately not vest. Accordingly, the Court will choose a middle course. The Court will reduce Ortega's lost pension benefit award as testified to by her actuary by the difference between $2,927 and $1,236,[65] or 42 percent, which results in a total lost pension benefits award of $216,716 ($515,990 x

[65] This amount represents the value of Ortega's state pension resulting from her state employment in the time period in which she is receiving lost pension benefits as part of her back pay award. To the extent that Ortega's state pension benefits might increase by her continued employment with the state government, those increased pension benefits would be from continued employment with the state in a non-overlapping time period with her pension damages award against the Board. They therefore would not off-set Ortega's lost pension benefits from her employment with the Board.

42 percent). At the same time, the Court will retain jurisdiction over this case for three months beyond the May 1, 2021 anticipated state pension vesting date. Should future events lead to Ortega's state pension not vesting by that date, then Ortega may file a motion with the Court seeking an additional lost pension benefit award to make up for the state pension benefits that she ultimately will not be receiving. *See, e.g., Stafford,* 749 F. Supp. at 792 (retaining jurisdiction to monitor the plaintiff's continued mitigation efforts while the defendant makes future damages payments according to an installment formula).

## CONCLUSION

Based on the foregoing analysis, the Court awards Ortega the following equitable relief:

(1)    Back pay through August 15, 2016 in the amount of $322,788, plus $47,511 in prejudgment interest, plus additional back pay and prejudgment interest through the anticipated date of judgment of November 30, 2017 of $60,398, for a total back pay award of $430,697;

(2)    Front pay in the amount of $83,512; and

(3)    Lost pension benefits in the amount of $216,716.

The Court will retain jurisdiction until August 1, 2021, and if, at that time, no motion has been filed for additional lost pension benefits, the case will be dismissed with prejudice.

_Thomas M. Durkin_
Thomas M. Durkin
United States District Judge

Dated: November 21, 2017